Whaley, Judge,
delivered the opinion of the court:
This case is before the court on a demurrer to the petition, on the ground that it does not allege facts which constitute* a cause of action against the United States.
It is alleged in the petition as follows:
Plaintiff owns and operates as a common carrier a railroad: line in Georgia extending from Macon to Vidalia and in.* *252 addition certain trackage rights, in all more than 50 but less than 100 miles in extent. It was required under the act of July 28, 1916, 39 Stat. 412, 429, to transport the mails. Under the authority of that act the Interstate Commerce Commission fixed and determined, by an order dated December 23, 1919, docket #9200, 56 I.C.C. 1, what it considered fair and reasonable rates for such transportation, effective from November 1, 1916, to January 1, 1918. This order provided that for separately operated railroads not exceeding 100 miles in length fair and reasonable rates were 20 percent additional to those prescribed for railroads more than 100 miles in length, and further provided that on and after January 1, 1918, fair and reasonable rates were 25 percent additional to those prescribed as of November 1, 1916.
On May 9, 1925, plaintiff, with other carriers, applied to the Interstate Commerce Commission for a reexamination of the prescribed rates. The application was duly heard, and the Commission issued an order dated July 10, 1928, 144 I.C.C. 615, finding the existing rates were not fair and reasonable on and after (so far as said order affected plaintiff) May 9, 1925, and providing that from May 9, 1925, to and including July 31, 1928, fair and reasonable compensation was 15 percent in addition to that paid or accrued at the established rates. Under this order separately operated railroads not exceeding 100 miles in length were entitled to receive compensation 80 percent higher than other roads. On and after August 1,1928, a scale of rates was to be effective, not necessary to set out here in detail, but materially higher for separately operated railroads 50 to 100 miles in length.
On October 6, 1920, in response to a request of the Post Office Department, the Commission, with reference to the aforesaid order of December 23, 1919, ruled that—
“A separately operated railroad, as named in paragraph 3 of the order of the Commission, is defined as a railroad having a separate corporate title and administrative organization, whose physical operations are separate and distinct from the operations of another railroad, and which renders separate accounting and operating reports to the Interstate *253 Commerce Commission and files in its own name separate freight and passenger tariffs.”
On November 19, 1921, the Commission, responding to a further inquiry from the Post Office Department, developed its definition of a “ separately operated railroad ” as follows:
“ The Commission’s construction as to what constitutes a ‘ separately operated railroad,’ as set forth in its letter of October 6, 1920, contains certain specific conditions which must exist in connection with the organization and administration of the affairs of a railroad in order to entitle it to be classed as ‘ separately operated.’ One of the conditions is that such a railroad must have a separate administrative organization. A railroad having an administrative organization composed of officers who are also officers of some other railroad or railroad system would not be regarded as coming within the purview of the requirement that a railroad must have a separate administrative organization in order to be classed as a ‘ separately operated railroad.’
“A railroad, therefore, not exceeding 100 miles in length, having a separate corporate title and administrative organization composed of officers, none of whom is at the same time an officer, agent or employee of some other railroad or railroad system, whose physical operations are separate and distinct from the physical operations of another railroad, and which renders separate accounting and operating reports to the Interstate Commerce Commission and files in its own name separate freight and passenger tariffs, comes within the class of 'separately operated railroads ’ as used in paragraph 8 of the Commission’s order of December 23, 1919.”
Certain of plaintiff’s officers were also, officers of another railroad, and except for such dual office-holding plaintiff came within the definition of a “separately operated railroad ” as thus elaborated by the Commission. Up to but not including May 21, 1931, plaintiff was not paid as a separately operated railroad not exceeding 100 miles in length for the mails it carried, but received the lesser pay given to roads otherwise defined.
Again, on July 3, 1930, on the application of certain carriers for classification as separately operated railroads, the Commission, 165 I.C.C. 774, held:
“ The fact that short-line railroads, for reasons of economy and for greater efficiency, voluntarily have officers in common with some road or roads does not of itself indicate *254 that they are not separately operated. The definition stated on October 6, 1920, requires a short-line railroad to have a 'separate administrative organization ’ and such an organization may in some instances be separate insofar as the-affairs of the carrier are concerned even though the officials, administering them are also performing similar functions-for another road or roads. The interpretation of the term ‘ separate administrative organization ’ as stated in the letter dated November 19, 1921, is, therefore, too narrow. In the-portion quoted supra the third sentence beginning: ‘A railroad having an administrative organization composed of officers who are also officers of some other railroad should be eliminated. The second paragraph of the same quoted matter is illustrative only and describes a separately operated railroad that has no officers in common with some other railroad. It is not to be construed as excluding roads: that have common officers but whose affiairs may in fact be-separately administered. The paragraph serves no useful purpose in this connection, is susceptible of a misleading-interpretation and, therefore, should be eliminated.”
On the date of the above order, July 3, 1930, and since-that time, plaintiff was a “ separately operated railroad within the meaning of the term as thus finally defined.
On May 21, 1931, plaintiff filed with the Interstate Commerce Commission an application, copy of which is attached to the petition herein as exhibit A, its general prayer-reading :
“ Macon, Dublin & Savannah Eailroad Company, hereinafter called applicant, hereby applies for a finding and order-of the Commission that, on November 1,1916, applicant was- and ever since that date has been, a separately operated railroad not exceeding 100 miles in length, and not less than 50 miles in length, within the meaning of the findings and orders of the Commission in this docket dated December 23,. 1919, and July 10, 1928, and as such is entitled to payment for transportation of mail matter at the rates fixed and determined by said findings and orders as fair and reasonable for common carriers thus classified.”
The Commission heard the case upon evidence and briefs: and entered its order dated June 27, 1932, copy of which is. attached to the petition herein as exhibit B. The Commission held that “ On that date [July 3, 1930] we changed the-classification and by that act the applicants were brought *255 within the class of roads for which higher rates were established ”, but refused to “ find that the higher rates should have been paid as of the date the modified classification became effective ”, disclaiming jurisdiction to do so.
The Post Office Department refuses to pay any additional •compensation for transportation of the mails during the period from July 3,1930, which is the date of the order that brings plaintiff within the classification entitling it to the higher pay, to May 20,1931, both inclusive, or up to date of its aforesaid application of May 21, 1931, and plaintiff seeks to recover the difference between the higher pay for short-line roads, and the pay it actually received, only for the period July 3, 1930, to May 20, 1931, both inclusive.
The authority of the Interstate Commerce Commission to determine just compensation for the required services may not well be questioned. “ Provided it be an impartial tribunal, and the property owner has an opportunity to be heard before it, the legislature may refer the matter [of just compensation] for determination to a jury, a court, a commission, or any other body it may designate.” State v. Rapp, 39 Minn. 65, 67.
The act of July 28, 1916, 39 Stat. 412, 430, vests in the Interstate Commerce Commission, for the purpose of determining just rates for transportation of the mails, “ all the powers which it is now authorized by law to exercise in the investigation and ascertainment of the justness and reasonableness of freight, passenger, and express rates to be paid by private shippers.” And the Interstate Commerce Commission is peculiarly fitted for the matter to be determined.
The question to be here decided is whether there is an order of the Interstate Commerce Commission which may be given effect by a suit against the United States. New York Central R.R. Co. v. United States, 65 C.Cls. 115, 128.
Section 5 of the act of July 28, 1916, supra, p. 430, provides inter alia, that: “ For the purpose of determining and fixing rates or compensation hereunder the Commission is authorized to make such classification of carriers as may be just and reasonable and, where just and equitable, fix general rates applicable to all carriers in the same classification.”
*256 In its findings and order of June 27, 1932, the Commission held that on July 3, 1930, plaintiff had been brought within the class of roads for which higher rates were (already) established. The retroactive effect of the order of July 3, 1930, is not here in question, for plaintiff makes no claim to additional compensation prior to July 3,1930. Giving effect to the conclusion that on July 3, 1930, plaintiff was brought within the higher-pay classification, and to the fact that on that date there were already in effect rates applicable thereto, it follows, under the statute of July 28r 1916, ut supra, that plaintiff was, on July 3, 1930, entitled to the just compensation provided for carriers of the higher-pay class. The purpose of the classification was to give carriers just compensation, equitably. The Commission’s order of June 27, 1932, did not undertake to fix rates for “separately operated railroads.” That had already been done-July 10,1928.
In its decision of June 27, 1932, the Commission found. (1) that on July 3, 1930, plaintiff had been classified by it as a “ separately operated railroad ”, and (2) that on and after May 21, 1931, fair and reasonable rates for the* plaintiff were the fair and reasonable rates established for “ separately operated railroads.” All this was saying no-more than that plaintiff’s classification was determined by a previous decision, that of July 3, 1930, and was effective on and after that date. The Commission could not, under the-act, work discrimination. It could not and did not determine that for the period July 3, 1930, to May 20, 1931, plaintiff was not entitled to rates provided for roads of its-class. What the Commission did attempt to determine adversely to the plaintiff was that it was, because of lack of protest, barred from receiving, for that period, the entire-amount of just compensation otherwise due.
The jurisdiction of the Interstate Commerce Commission under the act of July 28, 1916, supra, was limited. Congress reposed in the Commission the primary duty of determining just compensation, not whether by some act on the part of the carrier it was estopped as a matter of law from, receiving just compensation in its entirety. The actual payment was, under the act, within the province of the Post *257 master General, and the suit in this court arises through the failure and neglect of the Postmaster General to pay in full compensation found by the Commission to be just.
The question remaining is whether plaintiff, having received compensation during the period July 3, 1930, to May 20, 1931, both inclusive, less than that which was just, without protest before May 21, 1931, is now entitled to receive an additional amount to make up just compensation as fixed and determined by the Commission.
The situation lacks the elements necessary to establish acquiescence. There was no contention maintained by one side and denied by the other, under which acceptance of an amount tendered would have constituted a bar against claiming more, for there was not, and is not now, any dispute as to what was the amount of full and just compensation. There is no room for application of United States v. Childs & Co., 12 Wall. 232. See Mitchell v. United States, 267 U.S. 341, 344.
In United States v. N.Y. Central, 279 U.S. 73, 78, it was said (and this is relied upon by the Commission in its findings and order of June 27, 1932) : “ We assume that while the railroads perform these services and accept pay without protest they get no ground for subsequent complaint. American Smelting & Refining Co. v. United States, 259 U.S. 75, 78.” But in the New York Central case payment had been received without protest at the rates established for them by the Commission, and with that situation they had no ground for complaint at what they had accepted. In the instant case, while protest did not come until the petition was filed with the Commission, plaintiff had not in fact been receiving the rates established by the Commission, rates over which there was no contention on either side. The situation appears simply to have been one where plaintiff was paid and received less compensation than that already established by competent authority as just, unintentionally and without any idea that plaintiff was not entitled to receive more than it did receive.
Plaintiff could not protest against the finding of the Commission as to what compensation was just, for that was in its favor. Its protest, if any, could have been directed only *258 to the failure of the. Postmaster General to make payment in accordance with the Commission’s findings. The period of underpayment was of comparatively short duration, July 3, 1930, to May 20, 1931, both inclusive, somewhat less than nine months, and it may not be said that this period was so protracted as to establish, affirmatively, with all the other circumstances, including the fact that plaintiff was not free to decline performance, the defense of acquiescence. St. L. B. & M. Ry. v. United States, 268 U.S. 169, 174-177.
A judgment on the merits, if the plaintiff’s case be established, would be to give effect to such findings and orders of the Commission, as are within their jurisdiction, and taken in their entirety.
The demurrer should be overruled. It is so ordered.
Williams, Judge; LittletoN, Judge; and GeeeN, Judge, •concur.
Booth, Ohief Justice, did not hear this case, on account of illness, and took no part in its decision.