# UNITED STATES *v.* JONES, RECEIVER.

NO. 135.

Argued February 2–3, 1949.—Decided April 18, 1949.

*Solicitor General Perlman* argued the cause for the United States. With him on the brief were *Assistant Attorney General Morison, Stanley M. Silverberg, Samuel D. Slade, Morton Liftin, Arne C. Wiprud* and *Daniel W. Knowlton.*

*Moultrie Hitt* argued the cause and filed a brief for Jones, Receiver.

.

MR. JUSTICE RUTLEDGE delivered the opinion of the Court.

This controversy began in 1931, when respondent's[1] predecessors as receivers of the Georgia & Florida Railroad filed an application with the Interstate Commerce Commission for a reexamination of rates then applicable to it for transporting the mails. Since then, in one form or another, the dispute has found its way back and forth through the Commission and the courts, finally to come here now for the second time. See *United States* v. *Griffin,* 303 U. S. 226.

Through all these years the carrier and the Commission have been at odds over whether the railroad is entitled to an increase in the rates prescribed for its service for the period beginning April 1, 1931, and ending, as covered by the present suit, February 28, 1938. The case is now here on certiorari to the Court of Claims, 335 U. S. 883, which has rendered a judgment awarding respondent $186,707.06 as increased compensation due for the years 1931 to 1938, *Griffin* v. *United States,* 110 Ct. Cl. 330, contrary to the findings and orders of the Commission denying any increase beyond the amounts already paid for that service under the rates fixed by it. *Railway Mail Pay, Georgia & Florida R. Co.,* 192 I. C. C. 779; *id.,* 214 I. C. C. 66.

I.

A statement of the background and course of the litigation will aid in understanding the rather complicated problems presented, both on the merits and affecting jurisdiction.

---

[1] The present receiver, Alfred W. Jones, was substituted as respondent in No. 135 by order of this Court dated December 6, 1948. 335 U. S. 883. He is referred to as "respondent" in this opinion, although he is also the petitioner in No. 198.

In 1916 Congress enacted the Railway Mail Pay Act. 39 U. S. C. §§ 523–568. This embodied a comprehensive scheme for regulating transportation of the mails by railroad common carriers. Such carriers were required to transport the mails pursuant to the Act's provisions. These included that the carriers should be compensated at "fair and reasonable rates" to be fixed and determined by the Interstate Commerce Commission. The rates were to be established only after notice and hearing. But after six months from the entry of a rate order the Postmaster General or a carrier was authorized to apply for a reexamination of the order. 39 U. S. C. §§ 541, 542, 544–554.

The Commission was authorized to prescribe "the method or methods by weight, or space, or both, or otherwise, for ascertaining such rate," 39 U. S. C. § 542, and for the same purpose "to make such classification of carriers as may be just and reasonable and, where just and equitable, fix general rates applicable to all carriers in the same classification." 39 U. S. C. § 549. Other sections specify and define four classes of service, namely, full railway post-office car service, apartment service, storage-car service and closed-pouch service. 39 U. S. C. §§ 525–530.[2] Only apartment service and closed-pouch service are involved in this case.

On December 23, 1919, after extended investigation and hearings, the Commission entered its first general mail rate order. *Railway-Mail Pay,* 56 I. C. C. 1. This

[2] Full railway post-office car service involves service in which an entire car of specified length and equipment is authorized. Apartment-car service involves authorized use of thirty- or fifteen-foot apartments partitioned off from the remaining portion of the car. Closed-pouch service involves handling by railroad employees where full or apartment railway post-office cars are not authorized and where space authorizations are for units of seven feet and three feet in space, unenclosed, on both sides of the car.

adopted the space basis for determining "fair and reasonable rates." On July 10, 1928, in proceedings for reexamination the Commission granted a general increase of 15% over the preexisting rates. *Railway Mail Pay,* 144 I. C. C. 675. The Georgia & Florida Railroad accepted these general rates until April 1, 1931.

At that time it applied to the Commission for a reexamination of the rates as applied to itself. The application was heard and determined by Division 5. On May 10, 1933, the Commission denied any increase, holding the general rates established by the order of July 10, 1928, fair and reasonable as applied to this carrier. *Railway Mail Pay, Georgia & Florida R. Co.,* 192 I. C. C. 779. This order is in substance, though not technically, the one now involved.

After the Commission had denied reconsideration, the railroad sued in the United States District Court for the Southern District of Georgia to set aside the Commission's order. A special three-judge court was convened, cf. the Urgent Deficiencies Act, former 28 U. S. C. §§ 41 (28), 47; held the order unlawful; and remanded the case to the Commission for further proceedings. This decree was filed on January 23, 1935.

Thereupon the full Commission conducted further hearings and in a report filed February 4, 1936, again found the rates previously fixed to be fair and reasonable in their application to the Georgia & Florida Railroad. The order therefore denied any increase. *Railway Mail Pay, Georgia & Florida R. Co.,* 214 I. C. C. 66.

Again the carrier resorted to the District Court, filing a supplemental bill. And again that court, composed of the same three judges, held the Commission's order unlawful in a decree filed on February 23, 1937. The Government appealed directly to this Court, which, in *United States* v. *Griffin, supra,* held that the order was not of a type reviewable under the Urgent Deficiencies

Act.[3] Accordingly, on February 28, 1938, the District Court's judgment was reversed with directions to dismiss the bill and without determination of the cause on the merits.

After nearly four years the receivers renewed the litigation by filing this suit in the Court of Claims. The amended petition sets forth in some detail the history of the previous stages of controversy before the Commission and the courts. The carrier's basic claims on the merits are substantially the same as in those proceedings. They are, in effect, (1) that the Commission's orders denying any increase are confiscatory, in that the rates prescribed by the general rate order of July 10, 1928, and continued in effect specifically as to this carrier by the orders of May 10, 1933, and February 4, 1936, do not afford just compensation under the Fifth Amendment on the ground that they do not provide for payment of the cost of the service rendered plus a reasonable return upon invested capital allocated to that service; and (2) that the Commission's orders do not afford the "fair and reasonable" compensation required by the Railway Mail Pay Act.[4] Both claims rest upon attacks made on the Commission's findings as being unsupported by the evidence before it and on its conclusions as being contrary to that evidence.

To sustain jurisdiction in the Court of Claims, respondent rests upon § 145 of the Judicial Code, 28 U. S. C.

---

[3] See note 6.

[4] The amended petition and the brief assign both grounds. Nevertheless, respondent insists that his case is in fact grounded upon the constitutional basis. Indeed, so strongly does respondent insist upon this point of view that, without challenging the award or its amount, except for the disallowance of interest, he has sought and we granted certiorari in No. 198, in effect to have the judgment of the Court of Claims grounded solely on the Fifth Amendment footing as the basis for establishing his claim of accrued interest. See note 7 *infra*.

§ 250, now 28 U. S. C. § 1491, and upon statements made in part Fourth of the opinion in *United States* v. *Griffin,* 303 U. S. at 238.[5]

## II.

Although the Railway Mail Pay Act contains no explicit provision for judicial review of orders of the Interstate Commerce Commission fixing rates of pay for transporting the mails pursuant to authorizations of the Postmaster General for such service, it had been thought, until the decision in *United States* v. *Griffin, supra,* that such orders were of the kind reviewable under the Urgent Deficiencies Act. The effect of that decision, however, was to rule out such orders as those now in question from the jurisdiction conferred by the latter Act.

While the "negative order" basis for the Court's ruling is no longer effective, *Rochester Tel. Corp.* v. *United States,* 307 U. S. 125, the alternative grounding remains in full force. 303 U. S. at 234.[6] Since the very orders now in issue were involved in the *Griffin* case, it is settled that the railroad or its receivers had no recourse to

---

[5] As has been stated, the Court of Claims, accepting jurisdiction, rendered judgment for the respondent for $186,707.06. Its determination was based upon the various reports of the Commission above cited, although evidence was received by the court's commissioner which was not before the Interstate Commerce Commission. He made extensive special findings of fact based in part upon this evidence which were adopted by the court and filed, together with its opinion. 110 Ct. Cl. 330. Both the Government and the respondent applied for certiorari and both petitions were granted. See note 4.

[6] This was in brief that Congress could not be assumed to have made the extraordinary remedy of the Urgent Deficiencies Act applicable to such orders as the one here involved, since "There is no wide public interest in its speedy determination"; "no danger of temporarily interrupting the mail service through the improvident issue of an injunction by a single judge"; and "only the method or amount of payments currently to be made would be affected."

648

a district court, under the Urgent Deficiencies Act, for securing review of the Commission's orders or relief of the type now sought.

The Court in the *Griffin* case, however, was not content to rest merely with this negative jurisdictional ruling. In part Fourth of the opinion the Court went on to say that its ruling did not "preclude every character of judicial review." 303 U. S. at 238. The opinion then suggested three possible other methods, two in the Court of Claims and one in the district courts.

Without doubt it was due to these suggestions that respondent's predecessors chose to bring this suit in the Court of Claims. The language in which the suggestions were made has assumed such importance, in view of the problems raised by the receivers' choice in following them, that it seems wise here to quote in full what the Court said:

"If the Commission makes the appropriate finding of reasonable compensation but fails, because of an alleged error of law, to order payment of the full amount which the railroad believes is payable under the finding, the Court of Claims has jurisdiction of an action for the balance, as the claim asserted is one founded upon a law of Congress. *Missouri Pacific R. Co.* v. *United States,* 271 U. S. 603. Compare *United States* v. *New York Central R. Co.,* 279 U. S. 73, affirming 65 Ct. Cl. 115, 121. And since railway mail service is compulsory, the Court of Claims would, under the general provisions of the Tucker Act, have jurisdiction also of an action for additional compensation if an order is confiscatory. *United States* v. *Great Falls Mfg. Co.,* 112 U. S. 645; *North American Transportation & Trading Co.* v. *United States,* 253 U. S. 330, 333; *Jacobs* v. *United States,* 290 U. S. 13, 16. Moreover, as district courts have jurisdiction of every suit at law or in equity 'arising

under the postal laws,' 28 U. S. C., § 41 (6), suit would lie under their general jurisdiction if the Commission is alleged to have acted in excess of its authority, or otherwise illegally. Compare *Powell* v. *United States,* 300 U. S. 276, 288, 289." 303 U. S. at 238.

Respondent and the Court of Claims are at odds over whether the carrier's claims now asserted fall under the first or the second class of cases of which this Court said the Court of Claims would have jurisdiction. Respondent insists, both in the complaint and in the brief filed here, that his claim is grounded on the basis that the Commission's orders are confiscatory and have the effect of depriving the carrier of its property and services without just compensation due under the Fifth Amendment.

On the other hand, the Court of Claims expressly disclaims that it was exercising any jurisdiction over constitutional matters. This was done in denying the carrier's claim to interest on the award.[7] In the court's view therefore the jurisdiction which it was exerting fell within the first class of cases stated in the *Griffin* opinion to be within the Court of Claims' jurisdiction, namely, where the Commission makes the appropriate finding of reasonable compensation but fails, because of an alleged error of law, to order payment of the full amount the carrier believes payable under the finding.

The Government, however, insists that the Court of Claims did not exercise jurisdiction under this category.

---

[7] The opinion, quoting the Court of Claims' language in an earlier railway mail pay case, *New York Central R. Co.* v. *United States,* 65 Ct. Cl. 115, 128–129, affirmed 279 U. S. 73, stated: " 'We do not think the plaintiff can have judgment for interest on the deferred payments. We are not determining just compensation but are giving effect to an authorized order of the Interstate Commerce Commission. In such case the statute forbids the allowance of interest. Sec. 177, Judicial Code, as amended.' " 110 Ct. Cl. at 373. Cf. notes 10 and 29 *infra.*

It disputes that the court "gave effect," as the court stated,[8] to the Commission's order or ordered payment of any balance due under the Commission's finding. Rather, the Government urges, the court flouted that order, substituted its own judgment for the Commission's concerning the appropriate order to be entered, and in effect entered a wholly new and different order from that made by the Commission, together with a money judgment giving its own view effect.

Ordinarily it would be sufficient for us to take the Court of Claims at its word and accept its stated view of the nature of the jurisdiction it was exerting. But the three differing views of its action taken by itself, by the Government, and by the respondent, together with the difficulties each raises on the record for disposing of the cause, compel us to examine those claims.

If, as the court asserts, it was "giving effect" to the Commission's order and doing so without substituting its own judgment for the Commission's as to what was a "fair and reasonable rate," there should be little difficulty in sustaining the jurisdiction; [9] that is, unless respondent is right in his contention that the Court was called upon to and, notwithstanding its disclaimer, in fact did adjudicate his claim for just compensation under the Fifth Amendment. In that event and on the assumption that the award was proper on the merits, reversal would be required in order that the court might make appropriate allowance for interest.[10]

On the other hand, if the Government is correct in the view that the court did not give effect to the Commission's order, but instead disregarded that order and

[8] See note 7.

[9] See the cases cited at note 26 *infra*.

[10] Cf. *Jacobs* v. *United States,* 290 U. S. 13.

substituted its own judgment for the Commission's concerning what constituted a "fair and reasonable rate," the question arises whether the *Griffin* statements were intended to give that power to the Court of Claims under either category of jurisdiction the opinion said that court might have.

### III.

The Railway Mail Pay Act gives the Interstate Commerce Commission exclusive jurisdiction to determine "fair and reasonable rates." The Urgent Deficiencies Act provided for judicial review of the Commission's rate orders in "cases brought to enjoin, set aside, annul or suspend" such orders. No power was given the reviewing court to revise them when found invalid, or to render judgment for any amount thought to be due under such a revision.

It would be strange, indeed anomalous in the extreme, if this Court by its *Griffin* pronouncements intended to confer on the Court of Claims, by implication in the cases there held not reviewable under the Urgent Deficiencies Act, a broader, more conclusive and final power of judicial review than that Act expressly provided for like orders within its purview. The assumption is hardly tenable that Congress intended such a result when it enacted the Railway Mail Pay Act or the Urgent Deficiencies Act or both. Congress in no instance has expressly empowered the Court of Claims to review rate orders of the Commission,[11] either to set them aside or to render a money judgment for additional amounts found due upon a determination of an order's invalidity. To infer such an intention would be contrary not only in spirit to the limitations Congress has placed upon review of such orders wherever expressly provided, but

[11] See the cases cited at note 27 *infra.*

also to the whole history and practice of Congress in conferring jurisdiction on the Court of Claims.

Thus, when these very orders were twice before the district court, under the assumption that it had jurisdiction, that court found the orders invalid. But in each instance it remanded the cause to the Commission for further proceedings; there was no attempt to render a money judgment for the carrier.

Necessarily this restraint reflected the jurisdictional limitations placed upon the court by the Urgent Deficiencies Act. But those limitations themselves reflected another policy, quite apart from and in addition to that giving effect to the constitutional limitations of Article III.[12] The limitations exemplify settled congressional policy concerning the relations of rate-making bodies and reviewing courts. Not only is rate making essentially legislative in the first instance. The policy of judicial restraint is one having regard for the expertise of special agencies charged with performing the rate-making function and for the inherent actual, as well as legal, disability of courts to execute that function. Such doctrines or policies as those of "primary jurisdiction"[13] and exhaustion of administrative remedies[14] lie at the very root of the problem. And this is as true of the juris-

---

[12] Which, among other things, forbid non-District of Columbia courts created pursuant to that Article to exercise legislative functions such as rate making. Cf. *Keller* v. *Potomac Electric Co.*, 261 U. S. 428; *Postum Cereal Co.* v. *California Fig Nut Co.*, 272 U. S. 693; *Prentis* v. *Atlantic Coast Line*, 211 U. S. 210, 226.

[13] *Texas & Pacific R. Co.* v. *Abilene Cotton Oil Co.*, 204 U. S. 426; cf. *Rochester Tel. Corp.* v. *United States*, 307 U. S. 125, 139; *Myers* v. *Bethlehem Shipbuilding Corp.*, 303 U. S. 41. See 51 Harv. L. Rev. 1251.

[14] *United States* v. *Illinois Central R. Co.*, 291 U. S. 457, 463–464 (and cf. concurring opinion, *id.* at 465); *Myers* v. *Bethlehem Shipbuilding Corp.*, 303 U. S. 41, 50–52. See Berger, Exhaustion of Administrative Remedies, 48 Yale L. J. 981; 44 Mich. L. Rev. 1035.

diction of the Court of Claims, which is not restricted by Article III, as it is of courts so limited.[15]

Hardly can it be conceived therefore that Congress would have provided expressly for review of the Commission's rate-making orders by the Court of Claims; or that, if it had done so, it would have authorized a money judgment for such amount as that court in its own judgment considered the rate should have produced.

It is equally significant, we think, that when the three-judge district court twice set aside the Commission's order it did so on grounds substantially similar to those used by the Court of Claims in this case for holding the order invalid. In other words, what the district court did by way of examining the orders on their merits, factual as well as legal, the Court of Claims has done in this case. Indeed, it has gone much further, since it has rendered a money judgment for the carrier covering the period 1931–1938, having the effect in the particular circumstances of a new and final order.

## IV.

A full understanding of the Commission's orders and of the effects of the action taken regarding them, both by the three-judge district court and by the Court of Claims, can be had only by reading and comparing the reports and opinions.[16] The limitations of space prevent summarizing their content here in substantial detail. But the gist of the controversy between the Commission and the courts may be indicated.

We note, to begin with, that the court awarded to the respondent $186,707.06, or some 87 per cent more than the amount allowable under the Commission's orders.

---

[15] See the authorities cited at note 27 *infra*.

[16] The opinions of the three-judge court rendered when this controversy was twice before it are not reported.

This in itself shows the wide discrepancy between the Commission's view and the court's concerning the amount of a "fair and reasonable rate."

Moreover, the Commission's task in fixing that rate was both gigantic and complex. It was authorized to make classification of carriers where "just and reasonable" and, "where just and equitable," to "fix general rates applicable to all carriers in the same classification." 39 U. S. C. § 549. That authority of course was not to be ignored in applying the requirement for compensation of carriers at "fair and reasonable rates." 39 U. S. C. § 542. The two were not entirely separate, but were merely different prongs of the same fork.

In its first general rate proceeding the Commission classified the nation's carriers, for mail-pay compensation purposes, placing the Georgia & Florida Railroad in Class I.[17] It also decided generally upon the space basis as an appropriate method of determining fair and reasonable compensation. 56 I. C. C. 1.

Railroad accounting, however, does not, and concededly cannot, accurately reflect actual operating costs of each type of service rendered, or the proportionate amounts of capital employed in rendering each service. The Commission therefore sought a method or methods for making such allocations tentatively as the initial stage of performing its rate-making function. This required, first, segregating freight service from passenger train service; then dividing the latter into three cate-

---

[17] Class I included all railroads of more than 100 miles in length. At the general rate hearings the Georgia & Florida Railroad was represented by representatives of another class and seems to have contended that it should be classified with or treated as though it were a member of that class. But no question concerning its classification has been made in the proceedings begun in 1931 or afterward.

gories: passenger service proper (including baggage service), express service, and mail service.

The problem arose both in the proceedings culminating in the first general rate order, 56 I. C. C. 1, and in those resulting in the general rate increase of 1928. 144 I. C. C. 675. In the latter the initial separation of total operating expenses between freight and passenger services was made on the basis of the Commission's rules governing such separation on large steam railways. *Id.* at 685–688. But, for determining the cost of service in respect to the further allocation and apportionment of passenger-train service among its three components, the Commission, having determined upon the space basis for this initial stage in fixing "fair and reasonable rates," was faced with the problem of what should be done with unused space.

That problem presents the crux of this case, as it did of the Commission's action. In the proceedings leading to the 1928 order, three general plans were given primary consideration for distributing space. They are described in the report last cited. See *id.* at 681, 689. In general they were alike in allocating full-car[18] space to the service it performed. But they differed widely in allocating unused space in so-called combination cars and mixed cars.[19] Without going into further detail here, suffice it to say that Plan 3 allocated the largest amounts of unused space to passenger and express service and correspondingly the smallest amount to mail service; Plan 2, more nearly approximating the carrier's proposals, worked out in inverse proportions; and Plan 1 lay between the two. See 144 I. C. C. at 681, 689.

---

[18] See note 2.

[19] Combination cars include space separated by partitions into "apartments," cf. note 2, with each apartment devoted exclusively to a different use. Mixed cars contain no partitions or "apartments," but are used for several different services, *e. g.*, baggage, express and mail-pouch services. See note 2; 144 I. C. C. at 679.

The differences in results following from use of the various plans were highly significant, making the difference between net return and net deficit, or deficits of different sizes, depending upon which plan was used.[20] In each plan after the ultimate space ratios were determined by complicated statistical studies, they were applied to total passenger-train service expense to determine expense ratios for the three constituent services. And those expense ratios were also used to apportion investment in road and equipment assigned to passenger-train service.

The Commission rejected Plan 3 because, it said, that plan had departed from the car-operating unit which it had adopted for making space allocations. 144 I. C. C. 689–691. While not specifically eliminating Plan 1 from consideration for purposes of comparison, the Commission primarily rested its allocations of space for purposes of tentative or preliminary apportionment of costs and capital on Plan 2. *Id.* at 691.

In utilizing the ratios derived from using Plan 2, however, the Commission expressly stated:

"In connection with the cost studies under *any* of the plans for dividing the train space, it should be borne in mind that in computations of this character where the direct allocations are relatively small and the great bulk of expenses and investment are necessarily divided, subdivided, apportioned, and reapportioned *upon various theories and assump-*

---

[20] See *Railway Mail Pay*, 144 I. C. C. at 688–689. Plan 3, the Commission said in that general rate proceeding, would result in a "net railway operating income from mail of $18,759,056 instead of a deficit of $1,104,744 under plan 2, and a net income of $12,844,643 under plan 1," *id.* at 689, giving a net return under Plan 3 of 5.94 per cent but requiring an increased rate of 26.48 per cent under Plan 2 and of 7.43 per cent under Plan 1 to meet the computed deficits and give a net return of 5.75 per cent on the invested capital allocated to mail.

*tions,* the results can not be accepted as an accurate ascertainment of the costs of service. *At best,* they are approximations to be given such weight as seems proper in view of all the circumstances under which they have been obtained and the theories underlying the assumptions and the various steps in the computations." 144 I. C. C. at 691–692. (Emphasis added.)

The Commission proceeded to consider the results obtained by the use of the Plan 2 formula in the light of other circumstances and considerations deemed relevant, including comparison with results obtained upon the basis of the total equated 60-foot-car miles (see 144 I. C. C. at 692), the fact that there was no such incentive to limit the amount of space utilized for passenger, baggage and express services as existed in the case of mail service, *id.* at 693, and other factors. The Commission then concluded:

"Giving consideration to all the figures *based upon the respective cost studies;* to the fact that none of these figures except those in the carriers' exhibits, includes any charge against the passenger-train service for its proportion of the cost of handling nonrevenue freight; giving special weight to the figures based on the plan for the division of train space followed in the original proceeding and subsequent reexaminations; and making allowance for weaknesses of theories and methods, an increase of 15 per cent in mail revenues for the carriers as a whole in this group is justified." 144 I. C. C. at 695. (Emphasis added.)

This increase, very much smaller than a use of the results obtained by unqualified application of Plan 2 would have produced, resulted in general rates of 14.5 cents per mile of service in a "15-foot apartment car"

and 4.5 cents per mile of service in a "3-foot closed-pouch service space." Those rates became applicable to the Georgia & Florida Railroad, were accepted by it from 1928 to 1931, and are the rates now in question.

In this suit and in the prior proceedings since 1931, no attack has been made on the validity of these rates as general rates applicable to Class I carriers. But the 1931 proceedings challenged their validity as applied to this particular carrier. This has been the bone of contention throughout the subsequent phases of controversy.

When in 1931 the carrier's application for reexamination was filed, the Commission by its Division 5 first proceeded to make a cost study of the railroad's individual operations, conducted along the same lines as the cost studies in its general rate hearings. A test period of 28 days from September 28 to October 25, 1931, was selected for obtaining space and other data. Space ratios were determined on the data secured, applied to expenses, and the resulting expense ratios used to apportion investment, all under Plan 2. After adjustments made to reflect the year's operations for 1931, the Plan 2 formula worked out to show a net operating deficit for mail service of $4,945, which, together with a return of 5.75 per cent on the capital allocated by the formula to mail service, brought the carrier's claim for increased compensation for that year to $31,227. 192 I. C. C. 779, 781. To meet this, an increase of 87.40 per cent would have been necessary.

As in the general rate investigations and for the same reasons, the Division was unwilling to rest exclusively upon the results obtained by the computations under Plan 2, and went on to consider other factors which it deemed relevant in determining the fairness and reasonableness of the rates. It found that of the three component services in passenger-train service, "the mail service makes the best showing with respect to reve-

nue." [21] The Division further pointed out that in the period 1929 to 1931, mail revenues had been more stable than revenues from other passenger-train services, passenger service proper having decreased 67 per cent, express service 64 per cent, and mail service 12 per cent. Consideration also was given to the special facts shown relating to use of unused space.

Pointing out that the carrier's claim was based on the special cost study and the fact that "because of its low traffic density and low earnings per mile of road, it is not comparable with many class I roads which receive the same rates of pay," the Division reiterated that "The cost study is not considered to be an accurate ascertainment of the actual cost of service. It is an approximation to be given such weight as seems proper in view of all the circumstances. See *Railway Mail Pay, supra.*" 192 I. C. C. at 783. It then concluded:

"The comparison of mail revenue with other revenue received for services in passenger-train operations shows that mail with relation to the other services is bearing its fair share of the expenses of operation and is contributing relatively more than the other services for the space furnished. Applicant receives the same rates as those received by other roads for the same kind of service. Many of these other roads are, as applicant points out, roads which are very much larger and which have greater traffic and lower unit operating costs. On the other hand many are

[21] The report continued: "The total mail revenue of $35,728 for the year 1931 on a space ratio of 12.96 was only $594 less than the total revenue from passenger service proper, including baggage, and miscellaneous service, with a space ratio of 80.35 . . . . The distribution of expense upon the space ratios shows that the operating ratio for mail service was 102.79 as compared with 630.41 for passenger proper, including baggage, etc., and 249.67 for express." 192 I. C. C. at 781–782.

in much the same situation as the applicant in respect of passenger-train operations. The data submitted fail to justify giving the applicant rates higher than those now paid other railway common carriers for like service.

"We find that the rates of pay now received by applicant for the transportation of mail, established in *Railway Mail Pay,* 144 I. C. C. 675, for railroads over 100 miles in length, are fair and reasonable. The application for increased compensation is denied." *Ibid.*

When the cause was returned to the Commission by the Georgia District Court in 1935, the full Commission reopened the proceeding and held a further hearing at which further evidence was received. In remanding the cause the district court had stressed the computed finding under Plan 2 that "The distribution of expense upon the space ratios shows that the operating ratio for mail service was 102.79" [22] or, as the court added, "that for every dollar applicants received for transporting mails they expended one dollar and 2.79 cents." The court then asserted that other considerations taken into account by Division 5 "do not refute or impair the fact that the compensation allowed this railroad for the transportation of mail does not equal the cost of so doing."

Counsel for the carrier stressed this before the Commission as "an adjudication" that the previous rates of pay were "totally inadequate." But the Commission rejected the apparent district court inference that abandonment of mail service would save the carrier money: "Considering the character of the expenses included in the study it is clear that no such saving could be made. The importance of the operating-ratio figure has been overemphasized. Relative costs derived from a series

[22] See note 21.

of studies of expenditures for operations common to a number of services cannot be converted into absolute costs by using a single-figure relation derived from such studies." 214 I. C. C. at 69.

The Commission then again repeated its insistence that cost computed under such a formula as Plan 2 "is a hypothetical cost and not an actual cost," *ibid.;* that in other mail-pay proceedings consideration had been given to other factors; [23] and, again taking such factors into account, concluded upon the augmented record that the rates then applicable to the carrier were fair and reasonable. 214 I. C. C. at 70–76.

On return of the cause, the district court disclaimed entertaining the view "that the hypothetical cost is 'necessarily conclusive.'" Rather, the court said, "It is merely the fairest method that has been devised." It held inapplicable to the carrier the considerations utilized by the Commission to qualify the results computed by

---

[23] "In other mail-pay proceedings, in which space authorized and paid for was found to be the space that should be charged to mail in cost studies similar to that here, consideration was given to other factors as well, such as the amount and character of the unused space reported as operated (*Railway Mail Pay,* 85 I. C. C. 157, 170, 123 I. C. C. 33, 39); the actual space occupied by mail, as distinguished from authorized space, determined by the mail load carried, based upon a count of bags and of packages outside of bags, and, in some instances, by the weight (*Railway Mail Pay,* 95 I. C. C. 493, 500, 511, 120 I. C. C. 439, 446); comparisons with compensation received from other services in passenger-train cars (*Railway Mail Pay,* 144 I. C. C. 675, 706); comparisons with freight rates (*Railway Mail Pay,* 144 I. C. C. 675, 705, 151 I. C. C. 734, 742); comparisons per car-mile and per car-foot mile of the computed cost of mail service and the revenue from authorized mail service with the computed cost of corresponding units in passenger-train service as a whole (*Railway Mail Pay,* 144 I. C. C. 675, 699); and the character of the service performed in connection with transporting the mail (*Railway Mail Pay,* 56 I. C. C. 1, 8, *Electric Railway Mail Pay,* 58 I. C. C. 455, 464, 98 I. C. C. 737, 755)." 214 I. C. C. at 69–70.

the cost formula, such as "comparisons with compensation received from other services in passenger train cars"; and "comparisons per car-mile and per car-foot mile of the computed cost of mail service and the revenue from authorized mail service with the computed cost of corresponding units in passenger-train service as a whole." The court accordingly again found the Commission's order unlawful and remanded the cause to it a second time for further proceedings.

It is obvious, from the foregoing account, that the basic difference between the Commission and the district court lay in whether the Commission's statistical and mathematical computations under Plan 2 alone should be taken as determinative of costs and thus of fair and reasonable rates [24] or whether those computations were rightly taken by the Commission as merely tentative estimates or approximations, applicable in the initial stage of rate determination, but subject to qualification by comparison with results obtained under other plans and, in the final stage, by consideration of other factors found pertinent in the Commission's judgment.

This is exactly the question which was crucial in the judgment rendered by the Court of Claims. In its opinion, much more extended than either of those rendered by the district court, it said:

"Under finding 16 herein, it is shown that the Interstate Commerce Commission found and determined that plaintiff would require an increase in its mail revenue of 87.4% in order to secure for itself, under Plan 2 adopted by the Commission, a return of 5.75% theretofore fixed by the Commission, on its investments in road and equipment engaged in mail traffic. . . . *The Commission has, by its*

---

[24] It is to be recalled that the expense ratios based upon the space ratios accepted under Plan 2 were applied also to capital allocated to passenger-train service to apportion that capital among the three component services making up passenger-train service.

*use of Plan No. 2, adjudged it to be a fair and reasonable basis.* And out of that basis there has been ascertained, by formulae prescribed by the Commission, what is the fair and reasonable compensation for plaintiffs' carriage of the mails beginning the first of April 1931, and ending at the close of February 1938. Fair and reasonable compensation cannot be both a deficit and the amount of $186,707.06 so found. It is, we conclude, the latter." 110 Ct. Cl. at 366–367, 369. (Emphasis added.)

The court then quoted the Commission's concluding language in 192 I. C. C. 779, 783, set out above in the text, and said:

"We are of the opinion that the 'approximation' [Plan 2] should be given greater weight than the Commission affords it, because, as we have said, and the Commission in effect admits, there is no such thing as certainty in actual cost. Approximate, or as it is called, 'computed' cost must be relied upon, and as a matter of law must be decisive. There is no alternative, at least no satisfying alternative. Of course there were other methods of computing cost, but the Commission, put to the choice, selected Plan No. 2." 110 Ct. Cl. at 370.

Then followed rejection of the factors considered by the Commission in qualifying the computations obtained under Plan 2 as "not convincing or even persuasive." *Id.* at 372. According to the court: "It was for the Commission to demonstrate that the general rates prescribed gave the plaintiffs a fair and reasonable return. This the Commission failed to do. More than that, the Commission has by its findings, using its adopted plan and its own methods as applied to plaintiffs' circumstances, proved that plaintiffs have been underpaid $186,707.06 in fair and reasonable compensation for the period in question." *Ibid.*

In view of these groundings, the court's decision tied the Commission exclusively and finally to the results

which it had obtained by using Plan 2 in the initial stage of the rate-making process. It rejected the Commission's repeated assertion, in both the general rate hearings and the special hearings given this carrier, that the cost studies under Plan 2 (or any other such plan) could not be taken as an accurate ascertainment of actual costs of service and should be given only such weight as seemed proper in view of all the circumstances. The court likewise rejected as "not convincing or even persuasive" the numerous factors the Commission considered not only proper, but highly important to be taken into account in qualifying the computed results under Plan 2.

In doing all this the court substituted its own judgment for the Commission's concerning the relevance of facts to be taken into account in fixing a fair and reasonable rate; the weight to be given to those facts, including the computations under Plan 2 as well as the other facts utilized to check and qualify them; and the burden of proof on the whole case.

In the latter respect the court disregarded not only the general rule which gives administrative determinations in such matters presumptive weight,[25] but also the effect of the statute itself. As has been noted the Railway Mail Pay Act expressly authorized the Commission to classify carriers and "where just and equitable, fix general rates applicable to all carriers in the same classification." 39 U. S. C. § 549. While this general authority did not preclude examination of the general rate's application to a particular carrier, it gave that rate *prima facie* validity as to all within the classification. Indeed, contrary to the court's holding that the Commission could not consider rates paid to other carriers or their effects, the statute required the Commission to take those rates

---

[25] See, *e. g.*, *Shields* v. *Utah Idaho R. Co.*, 305 U. S. 177, 184–185. Cf. *Norton* v. *Warner Co.*, 321 U. S. 565, 568–569.

into account. *Ibid.* The burden of proof was therefore clearly upon the carrier to show that the general rate was unfair and unreasonable as applied to it and not, as the court held, upon the Commission to show that that rate as applied was fair and reasonable.

We cannot say that the Commission acted arbitrarily or unreasonably in respect to its use of Plan 2 or of the factors used in checking the plan's results and qualifying them. Contrary to the court's conclusion, Plan 2 was never intended or accepted by the Commission as furnishing a final and exclusive basis for fixing rates. Certainly it was not arbitrary or unreasonable to use such a plan, which proceeded step by step upon "various theories and assumptions," as merely a preliminary and wholly tentative step in the process of rate making; or to check its results against those produced by other such plans differing in detail of theories and assumptions employed; or to qualify the computations by the factors which the Commission took into account in the final stages of judgment.

In holding the initial formula conclusive, the court has disregarded the Commission's informed contrary judgment in matters committed to its special competence. This the court did in the guise of "giving effect" to the Commission's "finding," namely, its preliminary computations under Plan 2, and by disregarding all else the Commission took into account as "error of law." The "finding" was in fact no finding at all, but only a preliminary figure. And the matters thrown out as "error of law" were matters of fact and expert judgment, not legal questions.

We think the carrier has not sustained its burden of showing that the Commission acted arbitrarily or unreasonably and we conclude that the general rates fixed by its 1928 order are, upon the record made, fair and reasonable as applied to the Georgia & Florida Railroad. But

for the matter of jurisdiction, this determination would end the case. But the question of jurisdiction remains and is important. Moreover, the determination on the merits is relevant to its disposition.

## V.

In sustaining its jurisdiction, the Court of Claims stated: "As the Supreme Court has said, this Court has jurisdiction to render judgment of recovery for an amount sufficient to constitute fair and reasonable compensation *under the facts as found by the Commission,* unpaid through failure of the Commission, *because of an error of law,* to order payment thereof." 110 Ct. Cl. at 366. (Emphasis added.) That language on its face seems fully in accord with the *Griffin* pronouncement. As will be recalled, it was: "If the Commission makes the appropriate finding of reasonable compensation but fails, *because of an alleged error of law,* to order payment of the full amount which the railroad believes is payable *under the finding,* the Court of Claims has jurisdiction of an action for the balance, as the claim asserted is one founded upon a law of Congress." (Emphasis added.)

On its face this language does not authorize revision of the Commission's findings or of the rate it prescribes by the Court of Claims. The claim of which it is said to have jurisdiction is one for "the full amount which the railroad believes is payable *under the finding,*" some part of which the Commission has failed to order paid by reason of an error of law. There was no intimation of authority for the court to reexamine the facts or to substitute its own judgment concerning the facts to be considered or the weight to be given them in determining the rate. True, the wording reads "appropriate" finding. But we cannot construe that single word to mean that this Court intended the Court of Claims to reopen the entire question of the order's appropriateness and sub-

stitute its own judgment, either on the record made before the Commission or on independent evidence, for the Commission's findings and conclusions on that question.

Such a construction is sustained by none of the cases cited in the *Griffin* opinion to support the statement [26]

[26] Cited in the text, 303 U. S. at 238, were *Missouri Pacific R. Co.* v. *United States,* 271 U. S. 603, upholding the Court of Claims' view on demurrer that Congress, in enacting 39 U. S. C. § 536, not only intended to but had power to provide that land-grant railroads were to receive only 80% of whatever mail pay rate the Commission should set not only for mere transportation of mail (*e. g.,* closed-pouch space) but for space in which postal employees sorted mail (*e.`g.,* apartment mail-cars), and *United States* v. *New York Central R. Co.,* 279 U. S. 73, affirming the Court of Claims' conclusion that the Commission had power to make mail rate revisions applicable as of the date of the carrier's request for reexamination of rates rather than as of the date of the Commission order raising the rate.

Court of Claims mail pay decisions cited in a footnote, 303 U. S. at 238, n. 10, included: *Chicago & E. I. R. Co.* v. *United States,* 63 Ct. Cl. 585; *Nevada County N. G. R. Co.* v. *United States,* 65 Ct. Cl. 327; *Chicago & E. I. R. Co.* v. *United States,* 72 Ct. Cl. 407; *Macon, D. & S. R. Co.* v. *United States,* 78 Ct. Cl. 251; 79 Ct. Cl. 298. In each of these cases the claimant carrier recovered compensation in excess of that allowed it by the Postmaster General, but in each case the dispute centered around the *meaning* of a Commission rate order or the Commission's *power* to enter the order made; in none was there any challenge to the rate itself: Thus, in the first *Chicago & E. I. R. Co.* case, *supra,* the question was whether the Commission had, *in accordance with 39 U. S. C.* § *535,* ordered compensation for the return to their departure points of mail storage cars. In the second *Chicago & E. I. R. Co.* case, *supra,* the question was whether "closed-pouch space" was a "lesser unit" within the meaning of a rate order setting compensation for a "storage car or lesser unit." The *Nevada County N. G. R. Co.* case, *supra,* was a companion to *New York Central R. Co.* v. *United States,* 65 Ct. Cl. 115, affirmed 279 U. S. 73, holding that the Commission had power to order a rate increase effective as of the date of the application for such increase. Similarly, the two opinions in *Macon, D. & S. R. Co., supra,* held that the Commission had power retroactively to reclassify the claimant carrier in a higher compensation bracket as of a date prior to the carrier's application for reclassification so as

and is directly contrary to previous decisions by the Court of Claims with reference to its power to review such orders of the Commission.[27]   Moreover, to conceive

to impose on the United States liability for additional compensation from that retroactively determined date of reclassification.

With the prefatory admonition, "Compare," the *Griffin* footnote, 303 U. S. at 238 n. 10, cited two other Court of Claims railway mail pay decisions, *Pere Marquette R. Co.* v. *United States,* 59 Ct. Cl. 538, and *New Jersey & N. Y. R. Co.* v. *United States,* 80 Ct. Cl. 243: these decisions held the court powerless to fix mail pay rates or classifications, both functions being found to be within the exclusive purview of the Commission. See note 27 *infra.*

[27] In *Pere Marquette R. Co.* v. *United States,* 59 Ct. Cl. 538, the carrier sought compensation for mail car space furnished by the carrier where that space was neither authorized by the Post Office Department nor in fact used for mail transportation, and where the Commission had not ordered compensation; the Court of Claims said, *id.* at 545, in dismissing the petition:

"The act of July 28, 1916, clearly intended that all questions of the compensation to be paid railroad companies for carrying the mails should be determined by the Interstate Commerce Commission. The commission having acted within the scope of its authority, having fixed the reasonable compensation to which the plaintiff is entitled, this court can not review the action of the commission and undertake to fix a different compensation from that arrived at by the commission. If the plaintiff has performed any service which the commission has failed to provide for in its order fixing compensation, then the plaintiff's remedy is before the Interstate Commerce Commission and not in this court."

In *New Jersey & N. Y. R. Co.* v. *United States,* 80 Ct. Cl. 243, the Court of Claims dismissed a claim for compensation based on a classification which had been denied the carrier by the Commission; the dismissal was grounded on the proposition that "This court has no jurisdiction to classify railroads or to fix the compensation for the carrying of the mails." 80 Ct. Cl. at 248. Of the cases allowing money judgments for compensation, discussed in note 26 *supra,* the court observed that there "the recovery in this court merely carried into effect the Commission's determination, that is to say, this court did not undertake to make a classification or to fix a rate of compensation." 80 Ct. Cl. at 248. Cf. *Denver & Rio Grande R. Co.* v. *United States,* 50 Ct. Cl. 382, 391.

the *Griffin* statement as sanctioning the broad authority assumed by the court would be, for reasons already stated, to give it by implication a jurisdiction which Congress has never expressly conferred.

We think the *Griffin* language contemplated a much narrower jurisdiction. The purpose was, in our judgment, to indicate that review might be had of the carrier's claim whenever it does not run in the teeth of the Commission's findings or order or seek revision of that order. In other words, the claim must be one consistent with the Commission's order fixing the rate, but asserting underpayment by reason of some error of law in its application which would not require the Commission's further consideration for fixing a new rate. This view is consistent with all of the authorities cited in *Griffin* to sustain the first category of jurisdiction said to reside in the Court of Claims. It is the view we think this Court meant to be taken.

As we have pointed out, however, here the Court of Claims, though asserting the contrary, has not "given effect" to the rate order, but in the guise of finding "error of law" has set it aside, together with the Commission's findings; has substituted "findings" of its own; and has made, in effect, a new order by its judgment. It follows, in our view of what was intended by the *Griffin* statement, that the Court of Claims had no jurisdiction in this case, since it involves no such "error of law" as that statement contemplated, but relates only to questions essentially of fact going to the order's appropriateness on the merits. The case is wholly unlike *Missouri Pacific R. Co.* v. *United States,* 271 U. S. 603; *United States* v. *New York Central R. Co.,* 279 U. S. 73, and other cases cited in the *Griffin* opinion.

The same result would follow if, contrary to the Court of Claims' disclaimer, the suit could be regarded as one for just compensation under the Fifth Amendment, as

respondent insists it was. For the reasons already stated, respondent has not shown that the Commission's order was confiscatory in its effects. Moreover, jurisdictionally speaking, none of the cases cited by the *Griffin* opinion to sustain the second category [28] of jurisdiction in the Court of Claims involved any problem of reviewing rate orders of the Interstate Commerce Commission. All related to questions of compensation resulting from takings of private property for public use, in which the only questions determined were the value of the property taken or that value coupled with the right to interest on the award.[29] While respondent contends that the effect of the Commission's order here has been to deprive it of its property without just compensation and justifies the Court of Claims' award on that basis, the court did not so ground its decision and, as we have said, respondent has not made out any such case.

Moreover, in view of the fact that the Court of Claims has jurisdiction only to render a money judgment against the United States and none to remand to the Commission for further consideration a rate order which it might find confiscatory, we do not think the *Griffin* ruling can be taken to have contemplated that upon such a finding, made after reviewing the Commission's order on the merits, the Court of Claims could foreclose the Commission from further consideration of the order and render

---

[28] "And since railway mail service is compulsory, the Court of Claims would, under the general provisions of the Tucker Act, have jurisdiction also of an action for additional compensation if an order is confiscatory. *United States* v. *Great Falls Mfg. Co.*, 112 U. S. 645; *North American Transportation & Trading Co.* v. *United States*, 253 U. S. 330, 333; *Jacobs* v. *United States*, 290 U. S. 13, 16." 303 U. S. at 238.

[29] As to interest compare the *Great Falls* case with the *Jacobs* case, both cited in note 28.

final judgment for the amount by which it had found the order confiscatory. This not only would short-circuit the Commission in the rate-making process, but would involve substituting the court's judgment for the Commission's as to the amount of any new rate which might be fixed. Consequently, we do not think this case falls within either category of jurisdiction indicated by the *Griffin* statement as possibly available in the Court of Claims.

There remains the third remedy suggested in the *Griffin* opinion, namely, by suit in the district court as one at law or in equity "arising under the postal laws," former 28 U. S. C. § 41 (6) (cf. present 28 U. S. C. § 1339), where the Commission is alleged to have acted in excess of its authority, or otherwise illegally. Strictly speaking, it is not necessary to consider whether this remedy would have been available to respondent, since it has not been followed.

However, notwithstanding some obvious difficulties in making district court jurisdiction available for review in such a proceeding as this,[30] that jurisdiction possesses one outstanding advantage over review in the Court of Claims. It is that the district courts are not confined, as is the Court of Claims, to rendering a money judgment by way of relief against the United States. Under their general equity jurisdiction they would have power, on finding a rate order invalid, whether as confiscatory or as not complying with the statute, to remand the cause to the Commission for further proceedings. In this respect the review afforded and the relief given would more

---

[30] Our attention has not been called to attacks on railway mail rate orders based on this grant of jurisdiction; but it may be noted that district court suits to enjoin the Postmaster General's fraud orders are commonplace. See, *e. g., Williams* v. *Fanning,* 332 U. S. 490, 492, n. 2.

nearly approximate that given by the Urgent Deficiencies Act in similar cases reviewable under its terms.

Since the *Griffin* case was decided, Congress has adopted the so-called Administrative Procedure Act,[31] which by § 10, entitled "Judicial Review," provides:

> "Except so far as (1) statutes preclude judicial review or (2) agency action is by law committed to agency discretion—
>
> "(a) . . . Any person suffering legal wrong because of any agency action, or adversely affected or aggrieved by such action within the meaning of any relevant statute, shall be entitled to judicial review thereof.
>
> "(b) . . . The form of proceeding for judicial review shall be any special statutory review proceeding relevant to the subject matter in any court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action (including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus) in any court of competent jurisdiction. . . ." 5 U. S. C. § 1009.

This provision, we think, adds force to the suggestion made in the *Griffin* case concerning the jurisdiction of the district courts in relation to review of rate orders like those now in question. Such review under the equity or declaratory jurisdiction of those courts would seem to afford a remedy consonant with § 10 of the Administrative Procedure Act and also more nearly like that afforded by the Urgent Deficiencies Act, though without its expediting features. The relief afforded, unlike that required in the Court of Claims, could thus be limited to setting aside or enjoining the Commission's order and remanding the cause to it for further consideration, as

---

[31] 5 U. S. C. §§ 1001–1011.

is done in like cases reviewable by three-judge courts. Consistently with that jurisdiction also the review could be confined to the record made before the Commission [32] rather than one compiled by independent evidence not presented to the Commission or considered by it.

These suggestions, as we have said, are not strictly necessary for disposition of this case. But we think them appropriate in order to prevent a recurrence in the future and in other cases of long and chiefly jurisdictional litigation such as this cause has involved with profit to no one.

The judgment is reversed, and the cause is remanded to the Court of Claims with instructions to dismiss it.

*Reversed and remanded.*

MR. JUSTICE REED and MR. JUSTICE JACKSON took no part in the consideration or decision of this case.

---

[32] See *Tagg Bros.* v. *United States,* 280 U. S. 420, 444, n. 4. Cf. *National Broadcasting Co.* v. *United States,* 319 U. S. 190, 227; *Shields* v. *Utah Idaho R. Co.,* 305 U. S. 177, 185.