**J. W. WALKER, Plaintiff,**

v.

**UNITED STATES of America, Interstate Commerce Commission, Central Freight Lines, Inc., and W. W. Callan, Defendants.**

**Civ. A. No. 2864.**

United States District Court
W. D. Texas,
San Antonio Division.

Oct. 10, 1961.

Maynard F. Robinson, Moursund, Ball & Bergstrom, W. B. Jack Ball, Henry W. Moursund, San Antonio, Tex., Dan Felts, J. Malcolm Robinson, R. Dean Moorhead, Austin, Tex., for plaintiff.

George Nokes, Waco, Tex., Roland Rice, Washington, D. C., Carl Wright Johnson, Nat L. Hardy, San Antonio, Tex., Robert A. Bicks, Asst. Atty. Gen., John H. D. Wigger, Attorney, Department of Justice, Washington, D. C., Ernest Morgan, U. S. Atty., Western District of Texas, San Antonio, Tex., Robert W. Ginnane, General Counsel, Interstate Commerce Commission, Leonard S. Goodman, Attorney, Interstate Commerce Commission, Washington, D. C., for defendants.

Before BROWN, Circuit Judge, and RICE and INGRAHAM, District Judges.

PER CURIAM.

This is a proceeding to review a decision of the Interstate Commerce Commission approving, with certain modifications, a § 5, 49 U.S.C.A. § 5, application for acquisition of control of a motor carrier and a parallel approval under § 214, 49 U.S.C.A. § 314, for the issuance of securities in the form of promissory notes.[1] For the reasons pointed out, we do not yet reach the merits of the several attacks made by Walker, the Seller, in the proposed transaction. Oral argument demonstrated a wide divergence of

---

1. The transaction and the history of these proceedings is set forth in detail in the Report of the full Commission. Central Freight Lines, Inc.—Control—Alamo Express, Inc. January 22, 1959, 75 M.C.C. 731.

views as to just what the Commission had done. Consequently, the Court is of the opinion that to assure that the legal propriety of the Commission's action will be tested in the light of actual holdings, and not on various assumed holdings, the matter should be remanded to the Commission for clarification after which the whole proceeding will automatically come back to this Court for further and final disposition.

Only a skeletonized summary is necessary to pinpoint the area of significant divergence of construction of the Commission's action. Under the initial written contracts of June 30, 1956, between Walker and Hart,[2] Central agreed to pay an aggregate of $2,000,000 for all of the stock of Alamo Express, the carrier, and the two non-carrier affiliates, Cartage and W & H. The consideration for each was separately prescribed as was the cash down payment and deferred balance represented by installment promissory notes[3] payable over a ten-year period.

Division 4 initially disapproved the transaction because it would result in overcapitalization of Central. In the course of hearings held on Central's application for rehearing, Central and Callan proposed a modification. The essence of it was to take the purchase of W & H completely out of the picture. This was to be accomplished by Central assigning to Callan its right to purchase the W & H stock. The cost to Central would therefore be $1,000,000 for Express and Cartage, see note 3, supra. In the main, the full Commission approved this subject to one very significant condition.[4] The Commission required that in lieu of the unilateral Central-Callan Assignment of

2. Walker owned 60% and Hart 40% of the stock of the three corporations. Only Walker protests Commission approval. Hart has made supplemental modification agreements with Central and the Callans which the Commission has approved concerning the transfer and payment for his 40% stock of W & H. Consequently, the question of transfer of, and payment for, the stock in W & H relates solely to Walker's 60% ownership.

3. The contracts prescribed the following breakdown:

|  | Payments To | | |
| --- | --- | --- | --- |
|  | Walker | Hart | Total |
| **EXPRESS** | | | |
| Cash | $75,000 | $ 50,000 | $125,000 |
| Notes | 225,000 | 150,000 | 375,000 |
|  | | | $500,000 |
| **CARTAGE** | | | |
| Cash | $ 75,000 | $ 50,000 | $125,000 |
| Notes | 225,000 | 150,000 | 375,000 |
|  | | | $500,000 |
| **W & H** | | | |
| Cash | $150,000 | $100,000 | $ 250,000 |
| Notes | 450,000 | 300,000 | 750,000 |
|  | | | $1,000,000 |

4. There were several other conditions including a restriction on duplication of certain intrastate rights, the subsequent disposition of properties of W & H, the cancellation of certain leasehold interests and the accounting practices to be followed in writing off certain costs. None of these conditions is any longer the subject of any real contest.

September 4, 1957, a new contract be executed between Walker as Seller and Callan as Buyer of Walker's W & H stock. The effect of this would, of course, be that Central would then purchase only Express and Cartage. This would require $750,000 in notes and the issuance of notes in this amount was expressly authorized under § 214.

Since this condition could not possibly be met in view of Walker's demonstrated intransigence (both before the Commission and in Texas state court proceedings), Central sought further reconsideration. It is the order of the Commission on that rehearing which has produced the quandary. By its order of June 4, 1959, it determined that in lieu of the condition requiring substitution of a new contract between Callan and Walker for W & H stock "a condition requiring * * * Callan to give a surety bond to protect Central * * * against his failure to perform under the contract of June 30, 1956, would adequately cover the eventuality that the contingent liability of Central * * * might ripen into overcapitalization and would not interfere in matters pertinent to interpretation of the assignment and enforcement of the contract, which are properly for judicial determination." [5]

As Walker and Central and Callan read this order in the context of the totality of the Commission's actions, this is an approval of the entire initial proposed transaction of June 30, 1956. As such, it called for the payment to Walker of the sum of $300,000 in cash plus notes in the aggregate of $900,000. In addition, for Hart's interest in Express and Cartage an additional $300,000 in notes would be required. To consummate the June 30, 1956, contract (as modified as to Hart by his supplemental agreement) would therefore call for the issuance of promissory notes in the total of $1,200,000.

On the other hand, Counsel for the Commission reads the totality of the orders in a different way. In response to specific questions from the Court, his reply was categorical: the Commission has authorized the issuance of promissory notes in the total sum of $750,000 only; it has not authorized the issuance of promissory notes in the totals called for in the June 30, 1956, contracts, nor for those amounts due Walker alone under these three contracts. Affirmatively, he also stated that issuance of notes by Central in excess of $750,000 to Walker (or Walker and Hart) would be in violation of law.

It is, of course, absolutely certain that express formal approval under § 214 of the issuance of notes is limited to $750,000 in the order of January 22, 1959. At the same time it is urged by all except the Commission's Counsel that the provision for the surety bond protecting Central against "the contingent liability of Central" necessarily envisages that the Commission has approved the transactions in their original June 30, 1956, proposed form. That being so, they argue Central must issue promissory notes in the total sum of $1,500,000. Central would have no "contingent liability" unless it were permitted to consummate the original contracts. This would mean that Central would execute in its own name promissory notes payable to Walker and Hart as prescribed. This, they further insist, is wholly consistent with its prior disapproval because the Commission has concluded that since Callan, in the arrangement between him and Central, will alone finance the purchase of the W & H stock from Walker, there will in fact be no overcapitalization of Central. As a part of this contention they also assert that the construction put on it by Counsel for the Commission is too technical in the underlying assumption that the § 214 approval must be

---

5. The order portion expressly "ordered, That * * * (1) * * * Callan shall furnish a bond or other security approval by the Commission in an amount and form which will insure his financial responsibility and performance under the assignment of September 4, 1957 of the contract of June 30, 1956, for the purchase by Central * * * of the capital stock of W & H * * *."

expressly stated rather than by an obvious implication of the full approval of the original transaction.

Distinctly different legal problems arise depending upon the reading of the totality of the Commission's orders on this phase. The matter is therefore remanded to the Commission for clarification whether the approval of the § 5 application does or does not constitute appropriate authorization under § 214 for the issuance of the promissory notes to Walker (and Hart as appropriate) as called for in the initial contracts of June 30, 1956. We do not undertake to prescribe the manner in which the Commission is to conduct further proceedings except that it is requested that the matter be expedited to the maximum possible extent, and that in the supplemental orders or reports, the Commission indicate with appropriate required specification its findings, reasons and conclusions with respect to the total amount of promissory notes payable to Walker (or Hart as appropriate) which Central is authorized under § 214 to issue. In the event the Commission were to approve the issuance of promissory notes payable to Walker (or Hart as appropriate) in sums less than the aggregate called for by the initial contracts of June 30, 1956, the findings, reasons and conclusions should also cover expressly the general problem of whether there may be a § 5 approval as a proposed transaction since any such limitation on the amount of securities might mean that the transaction could not be consummated in literal compliance with the terms of the private contracts.

The Court expressly reserves decision on each and every question presented in the case and record. It in no way intimates that the Commission can, or claims the right to, compel the parties to make a new contract or a modification of the initial contracts. The Court will retain jurisdiction, and to preserve the status quo continues in effect the restraining orders heretofore entered against the prosecution of the private litigation in the Texas state courts.