J. W. WALKER, Plaintiff,

v.

UNITED STATES of America, Interstate Commerce Commission, Central Freight Lines, Inc., and W. W. Callan, Defendants.

Civ. A. No. 2864.

United States District Court
W. D. Texas,
San Antonio Division.

Aug. 10, 1962.

Ben H. Rice, Jr., J., dissented.

Maynard F. Robinson, Moursund, Ball & Bergstrom, W. B. Jack Ball, Henry W. Moursund, San Antonio, Tex., Dan Felts, J. Malcolm Robinson, R. Dean Moorhead, Austin, Tex., for plaintiff.

George Nokes, Waco, Tex., Roland Rice, Washington, D. C., Carl Wright Johnson, Nat L. Hardy, San Antonio, Tex., Robert A. Bicks Asst. Atty. Gen., John H. D. Wigger, Atty., Dept. of Justice, Washington, D. C., Ernest Morgan, U. S. Atty., Western Dist. of Texas, San Antonio, Tex., Robert W. Ginnane, Gen.

Counsel, Leonard S. Goodman, Atty., Interstate Commerce Commission, Washington, D. C., for defendants.

Before BROWN, Circuit Judge, and RICE and INGRAHAM, District Judges.

JOHN R. BROWN, Circuit Judge.

The subject of this case is the proposed acquisition by Central[1] and its principal owner and officer-director Callan[2] of Express,[3] a motor carrier, and two non-carrier affiliate enterprises, Cartage and W & H.[4] The sellers were Walker and Hart who owned 60% and 40%, respectively, of the capital stock of these companies. The purchase price as proposed in the 1956 contracts aggregated $2 million.[5]

After a series of orders the Commission has granted a § 5 approval to Central and Callan for the acquisition of control of these enterprises. The sole plaintiff here is Walker, one of the two sellers. In a broad sort of way his position therefore is that the Commission may not legally approve the sale which he contracted to make. The Government and the Commission, quite understandably, attack the standing of Walker to challenge the order of the Commission approving the sale and transfer Walker proposed to make.

On the initial submission and argument to us, a very serious question arose as to just what the Commission had or had not intended. This grew out of the orders which in effect approved acquisition of Express and Cartage by Central since the acquisition (and obligation for payment) of W & H was, with Commission approval, to be made by Callan as assignee of Central. The problem then thought to be acute was whether by these orders and certain conditions imposed on Callan, the Commission in effect had simultaneously granted a § 214 approval for the issuance by Central of the promissory notes payable to Walker in part payment of the purchase price of his stock in W & H.[6] This Court by brief opinion

---

1. Central Freight Lines, Inc.

2. W. W. Callan.

3. Alamo Express, Inc.

4. Cartage: Alamo Cartage Company
   W & H: W & H Investment Company

5. It was broken down as follows:

| | | Payments to Walker | | Payments to Hart | | Total |
|---|---|---|---|---|---|---|
| | | (a) Notes | (b) Cash | (c) Notes | (d) Cash | (e) |
| I. | Express | $225,000 | $ 75,000 | $150,000 | $ 50,000 | $ 500,000 |
| II. | Cartage | 225,000 | 75,000 | 150,000 | 50,000 | 500,000 |
| III. | W & H | 450,000 | 150,000 | 300,000 | 100,000 | 1,000,000 |
| IV. | Total Notes | $900,000 | | $600,000 | | $1,500,000 |
| V. | Total Cash | | $300,000 | | $200,000 | 500,000 |
| | | | | | | $2,000,000 |

| Recap. | | (a) Notes | (b) Cash | (c) Total |
|---|---|---|---|---|
| VI. | Express | $375,000 | $125,000 | $500,000 |
| VII. | Cartage | 375,000 | 125,000 | 500,000 |
| VIII. | W & H | 750,000 | 250,000 | 1,000,000 |
| | Totals | $1,500,000 | $500,000 | $2,000,000 |

6. This would be $450,000. See Item III column (a), note 5, supra.

Of course the 1956 contract called for notes in the sum of $750,000 (see Item III, columns (a) and (c) and VIII, Column (a)). But this included $300,000 of notes to Hart (see Item III, Column (c)). Hart has subsequently made a supplemental agreement, approved by the Commission, dispensing with these notes.

remanded the matter to the Commission for clarification and further orders. Walker v. United States, W.D.Tex., 1961, 204 F.Supp. 918.[7]

The Commission, pursuant to this remand, has taken further action and has, as directed by us, now certified to us two additional separate, but simultaneous, orders and reports.[8] Before discussing these supplemental reports or assaying their legal significance, we think it helpful to repeat here the broad latitude we afforded the Commission in its reconsideration under our interim remand:[9]

"[1] The matter is therefore remanded to the Commission for clarification whether the approval of the § 5 application does or does not constitute appropriate authorization under § 214 for the issuance of the promissory notes to Walker (and Hart as appropriate) as called for in the initial contracts of June 30, 1956. [2] We do not undertake to prescribe the manner in which the Commission is to conduct further proceedings except that it is requested that the matter be expedited to the maximum possible extent, and that in the supplemental orders or reports, the Commission indicate with appropriate required specifications its findings, reasons and conclusions with respect to the total amount of promissory notes payable to Walker (or Hart as appropriate) which Central is authorized under § 214 to issue. [3] In the event the Commission were to approve the issuance of promissory notes payable to Walker (or Hart as appropriate) in sums less than the aggregate called for by the initial contracts of June 30, 1956, the findings, reasons and conclusions should also cover expressly the general problem of whether there may be a § 5 approval as a proposed transaction since any such limitation on the amount of securities might mean that the transaction could not be consummated in literal compliance with the terms of the private contracts." 204 F.Supp. 921.

Insofar as the report in the so-called control case Docket MC–F–6339 is concerned, the Commission's supplemental report reflects that as a current interpretation of a prior event, the Commission holds that its approval of the assignment to Callan of Central's proposed purchase of W & H and the condition requiring Callan to furnish a surety bond against contingent liabilities on Central's part did not impliedly authorize the issuance of Central's promissory notes payable to Walker in the additional amount of $450,000.[10]

If the matter stood there, a considerable question might exist as to whether there was not such a marked departure from the terms of Walker's 1956 contract with Central that it would be a wholly academic thing for the Commission (or this Court in review thereof) to go through the motions of approving such a

7. At three places we made an error (which fortunately misled no one) in tying Walker, Central and Callan together in various contentions. The italicized words should be deleted from this portion: "As *Walker and* Central and Callan read this order * * *." 204 F.Supp. 920. Italicized words should be inserted in this portion: "On the other hand, Counsel for the Commission (*as well as Walker*) reads the * * * orders in a different way." 204 F.Supp. 920. And the portion "by all except the Commission's Counsel" should be deleted and the italicized words substituted so that the phrase reads: "At the same time it is urged *by Central and Callan* that the provision for the surety bond * * *" 204 F.Supp. 920.

8. Each is dated February 23, 1962. One bears the style "M.C.–F–6339–Central Freight Lines, Inc.—Control—Alamo Express, Inc." as previously. But to this is appended a footnote "This report embraces Finance Docket No. 19431, Central Freight Lines, Inc."

The other report is styled "Finance Docket No. 21819, Central Freight Lines, Inc., Note."

9. For ease of discussion we have inserted the numbered brackets [1], [2] and [3].

10. See note 6, supra.

drastically revised contract as the "proposed transaction," § 5, 49 U.S.C.A. § 5. But it does not stand there. This is so because the Commission, simultaneously with its consideration of the Control Case, conducted an additional proceeding under the new Finance Docket No. 21819 (see note 8, supra) and in its simultaneous order it likewise approved the issuance by Central of the additional $450,-000 promissory notes payable to Walker at times, amounts and at interest rates precisely in accord with the 1956 agreement.

This whole case—both before and subsequent to our limited remand—has been needlessly complicated by the Commission's persisting in the fiction that the "control" and the "Finance" matters are separate. We can acknowledge, of course, that as to each, different statutory requirements and principles must be satisfied. Likewise, as a matter of administrative housekeeping, it perhaps makes for a more neat and orderly disposition to segregate them by separate docket numbers. At the same time, they are one proceeding. Each must be read in the light of the other. The express deficiency of one may be overcome by the express or implied conclusions of the other and, conversely, the express grant in one might be markedly affected by an implied condition in the other. Thus, issuance of a § 5 approval of the "proposed" transaction necessarily has to take into account the *method* of financing. On the other hand, approval of the issuance of securities in a § 214, 49. U.S.C.A. § 314 finance proceeding necessarily takes into account the occasion (i. e., necessity) for such financing. Each is interdependent. Each is interlocked.

And whatever might be the treatment to be accorded this segregation of dockets in the normal situation (either on a statutory review or while pending before the Commission for administrative action), the terms of our remand to the Commission obviously contemplated that the Court was seeking guidance and direction from this expert body on whether the transaction as a whole was or was not presently approved. The language used by us in sentence [1] does speak in terms of "clarifying" whether the existing order or orders now constitute appropriate authorization. But it is plain by sentence [2] that three things were contemplated. First, it was recognized that the Commission had to hold further proceedings. As to these we disclaimed any purpose "to prescribe the manner in which the Commission is to conduct further proceedings," 204 F.Supp. 921. Second, we recognized that its action might be in several papers as we referred to "the supplemental orders or reports" which the Commission would issue. Third, and of more importance, we expressly required that "the Commission indicate with appropriate required specifications its findings, reasons and conclusions with respect to the total amount of promissory notes payable to Walker * * * which Central *is* authorized under § 214 to issue." 204 F.Supp. 921. We italicize the word "is" to emphasize that we were seeking current, contemporary determination by the Commission. We were not concerned merely with previous determinations. The issue was squarely presented to us: what notes, if any, has the Commission authorized Central to issue to Walker for W & H stock? We needed, and we sought, determination of that precise problem by the Commission. Moreover, our order invested it with adequate authority to undertake such proceedings as in the Commission's judgment might be required. This is made doubly clear by the terminology of sentence [3] which in terms of futurity spoke of "in the event the Commission *were* to approve the issuance of promissory notes * * * in sums less than the aggregate called for * * *." 204 F.Supp. 921.

This Court was concerned with the amount of promissory notes which the Commission authorized Central to issue to Walker for W & H stock. This Court was not concerned with the manner in which the Commission, under its procedures, felt obliged to manifest that decision. Where the Commission chooses

to chop a single thing into two bits, we are not so handicapped. Rather, we interpret the simultaneous reports growing out of one transaction as a single determination. In this approach, we are able to distill from two simultaneous decisions the following: in addition to the authority to issue promissory notes payable to Walker and Hart in the amount of $750,000 in payment for stock in Express and Cartage (see note 5, supra), Central is also now formally authorized to issue a note payable to Walker in the sum of $450,000 representing the agreed deferred price for his stock in W & H (see note 6, supra). Thus an aggregate of $1,200,000 in promissory notes is now approved.[11]

As it is specifically to be a promissory note of Central payable to Walker, this means that the Commission necessarily approves Central performing this obligation imposed on it by the terms of the 1956 agreement.[12] In no other way could the Commission conceivably have approved the execution and issuance by Central of its note payable to Walker in any such substantial sum. Of course, it is equally plain that behind this approval is the fact that as between Central and Callan the Commission considers that Central has assigned to Callan its rights and obligations under the 1956 agreement with respect to W & H. Likewise it is equally positive that without that assignment vis-a-vis Central and Callan the Commission would not have approved either the proposed transaction or the issuance of the additional note in the sum of $450,000. This latter is decisively demonstrated by the meticulous provisions set forth in the Finance Docket report and order, the effect of which is that while

Central has an outstanding obligation to Walker (or those holding the note of which he is the payee) for $450,000 payable over a 10-year period, it actually has none. This is so because Callan is required simultaneously to "pay for" the note before issuance to Walker, and Central is then required to invest this "payment" by Callan in interest bearing securities for periodic sale to supply the funds for retirement of the note as installments fall due.[13] As to that portion of the sales price of W & H stock payable in cash to Walker ($150,000, see note 5, supra), there was no need for this elaborate machinery since under the Central-Callan assignment, the cash would come from Callan for delivery to Walker through Central as a conduit. But so far as Commission approval is concerned, Walker has no right to complain that, either for the note given to him by Central for W & H stock, or the cash turned over to him by Central for the cash payment, it is Callan who ultimately bears the risk and, upon final consummation of the transaction it is Callan, not Central, who will end up owning W & H.

Since we regard the report in Finance Docket 21819 as a supplemental and integral part of the pending Commission proceedings under review, it follows that whatever attack Walker has made, or makes, as to the supplemental report in MC–F–6339 is available to him as to it as well. This is so even though no separate appeal has formally been taken. Walker's contention that this supplemental order is invalid because "wholly in camera" is unfounded. Walker had notice of the application and filed a formal pleading seeking the outright dismissal of the "new" application. He was

11. The remaining $300,000 of promissory notes specified in the 1956 contract represents the deferred payment to Hart as to which an approved supplemental agreement has been made, see note 6, supra.

12. The report in Finance Docket 21819 states: "The additional note would be payable in the manner specified by the contract of June 30, 1956, in 10 equal annual installments * * *."

13. The report reads: "The note would be issued and delivered only after payment of its full face value in cash to Central by Callan. The proceeds of its sale would be placed by Central in a special fund to be invested in interest bearing securities returning at least 3½ percent per annum, and the securities would be converted to cash in annual amounts equivalent to the payments on the note as they become due."

not denied the right to participate in it. Indeed, he seemed to regard it with disdain. Walker fails likewise as to the merits. There was no need for any further or new evidence since Callan is required to provide in advance the funds with which to make the cash payment and to fund the retirement of the note. Broad jurisdiction is granted to the Commission on the issuance of securities. Its jurisdiction is "exclusive and plenary." The Commission, in approving issuance of securities, is to determine whether the issuance will be "compatible with the public interest" and whether issuance " * * * is necessary or appropriate for or consistent with the proper performance by the carrier of service to the public * * *." § 20a(2), 49 U.S.C.A. § 20a(2). The application has to be in writing properly verified, § 20a(4), and notice is expressly required only as to the governor of relevant states and other public agencies. § 20a(6). The necessity and type of hearings, as such, is left broadly to the Commission. "The Commission may hold hearings, if it sees fit, to enable it to determine its decision upon the application for authority." § 20a (6). Alleghany Corp. v. Breswick & Co., 1957, 353 U.S. 151, 175, 77 S.Ct. 763, 1 L.Ed.2d 726, and see also Breswick & Co. v. United States, S.D.N.Y., 1957, 156 F.Supp. 227, 230, reversed on other grounds, 355 U.S. 415, 78 S.Ct. 421, 2 L. Ed.2d 374. And for quite understandable reasons, the statute expressly recognizes that Commission action may be complete or partial, final or conditional, and that as conditions change, it may "from time to time, for good cause shown, make such supplemental orders * * * as it may deem necessary or appropriate * * *" § 20a(3). Arrow Transportation Co. v. United States, N.D.Ala., 1959, 176 F.Supp. 411, affirmed 361 U.S. 353, 80 S.Ct. 406, 4 L.Ed.2d 362; and see cases in which the Commission has reopened proceedings pending review United States v. Chicago, Milwaukee, St. Paul & P. R. Co., 1935, 294 U.S.

499, 504, 55 S.Ct. 462, 79 L.Ed. 1023; Koppers Co., Inc. v. United States, W.D. Pa.1958, 166 F.Supp. 96; Boston & Maine R. v. United States, D.Mass., 1957, 153 F.Supp. 952.

Reading all of these Commission reports, including the two latest ones, together, practically all of the points urged so vigorously by Walker now wash out. Thus we find it unnecessary to consider specifically the subsidiary, though threshold dispute, over whether Walker has standing as such to challenge these orders. We may assume, without deciding, that he does.

■ But standing to challenge is quite distinct from the scope of the challenge which may then be made. Here Walker is in a unique position. He made a contract to sell all of his interest in all of these companies. Whatever rights the Texas State Court litigation may accord him in avoiding fulfillment of the contracts, he may certainly not contend before the Commission that the contract he made was illegal.

■ Again, assuming that as one having "standing" he may perhaps have the right to demand procedural orderliness, his appeal fails on its merits. In effect he asserts that the Commission after first disapproving the 1956 contract because of apprehended overcapitalization, did not have the power either to change its decision or grant extensions of time for consummation of the transaction when and as approved. Especially is this true, says Walker, when this was done over his protest that the Commission should not honor any application for rehearing or relief filed by Central unless joined in by him. As to this, Walker was not the applicant for a § 5 approval. This was not a merger or two carriers seeking permission to combine. It was an application by a carrier (Central) to acquire control over another carrier (Express) and the applicant was Central (and Callan as one in control of a carrier under the Marshall Transport Doctrine.[14] §§ 5(2) (a) (i) and (b), 212(b).

14. United States v. Marshall Transport Co., 1944, 322 U.S. 31, 64 S.Ct. 899, 88 L.Ed. 1110.

With regard to rehearing and timeliness the Commission has great latitude under the statute. §§ 5(2) (b), 16(6) and 204(a) (6), 49 U.S.C.A. §§ 5(2) (b), 16(6), 304(a) (6). See also Seatrain Lines, Inc. v. Pennsylvania R. Co., D.N.J., 1952, 108 F.Supp. 113, 126; Philadelphia-Detroit Lines v. United States, S.D.Fla., 1939, 31 F.Supp. 188, aff'd 308 U.S. 528, 60 S.Ct. 384, 84 L.Ed. 446; Lubetich v. United States, W.D.Wash., 1941, 39 F. Supp. 780, aff'd 315 U.S. 57, 62 S.Ct. 449, 86 L.Ed. 677; Los Angeles-Seattle Motor Express, Inc. v. United States, W.D.Wash., 1941, 39 F.Supp. 783. Additionally, with this three-ring Donnybrook proceeding before the Commission, this Court and the State Court, there was every reason why, for the protection of Walker and all others, the time for consummation was successively extended in the past, just as it must be for the future, until such time as the legal rights of the parties to the 1956 contract are judicially determined and the transaction either closed or abandoned.

■■ The attack fares no better as to either sufficiency of evidence or the findings. As for the former, we would doubt seriously that a seller in a contract expressly subject to Commission approval may even question the validity of the agreement or the propriety of its consummation. But assuming any such right, the Commission had an abundance of evidentiary support for its approval in principle of the sale and the transfer of control. The only doubt ever expressed by the Commission has been its apprehension as to overcapitalization of Central had the transaction been consummated without the conditions and provisions now imposed (as between Central and Callan). So far as these represent matters which Walker may challenge, the Commission reports are quite sufficient to indicate the basis for Commission action. Amarillo-Borger Express, Inc. v.

United States, N.D.Tex., 1956, 138 F. Supp. 411, vacated as moot, 352 U.S. 1028, 77 S.Ct. 594, 1 L.Ed.2d 598; Dixie Carriers v. United States, S.D.Tex., 1956, 143 F.Supp. 844, vacated as moot, 355 U.S. 179, 78 S.Ct. 258, 2 L.Ed.2d 186. In dealing with the objection of overcapitalization, the Commission has adequately revealed why each of the various proposed conditions or modifications of them will satisfy the demands of and "be consistent with the public interest." § 5.

■ Finally, we do not think that the existence of a serious dispute between the parties as to the legal enforceability of the 1956 contract deprived the Commission of power to approve the transaction with the modifications and conditions effectually imposed as between Central and Callan. Nor, finding the existence of power, does it make the grant of that approval erroneous. This is not a merger as such. Hence, the unique limitations as to a mutually acceptable voluntary merger do not apply. St. Joe Paper Co. v. Atlantic Coast Line R. Co., 1954, 347 U.S. 298, 74 S.Ct. 574, 98 L.Ed. 710; cf. Louisville & Nashville R. Co. et al.-Control-Interstate Railroad Co., Finance Docket No. 20763, December 4, 1959. As to a proposed acquisition, the applicant is the party who proposes to acquire. § 5(2) (a).[15] The carrier being acquired is not a party. The Commission's responsibility is not that of a court sitting to enforce a contract. Its responsibility is to determine whether, on the statutory standards relating to public interest, it will approve acquisition on the proposed or modified terms. Indeed, its power and duty is to impose "such terms and conditions and such modifications as it shall find to be just and reasonable * * *." § 5(2) (b). Its order, therefore, is permissive only. New York Central Securities Corp. v. United States, 1932, 287 U.S. 12, 26, 53 S.Ct. 45, 77 L.Ed. 138; O. C. Wiley

15. Under § 5(2) (b), the application is to be filed by the "carrier or carriers or person seeking authority." See also Marion Trucking Co., Inc.—Purchase—Harwood Trucking, 50 MCC 613, 620 (1948).

& Sons v. United States, W.D.Va., 1949, 85 F.Supp. 542, 544, affirmed 338 U.S. 902, 70 S.Ct. 308, 94 L.Ed. 555; Benton v. United States, M.D.Ga., 1953, 114 F.Supp. 37, 43; and see many other cases cited recently in Texas & New Orleans R. Co. v. Brotherhood of Railroad Trainmen, 5 Cir., 1962, 307 F.2d 151 at note 4 and preceding appended text [No. 19164, July 6, 1962]. It does not compel action by either the applicant or the carrier-to-be-acquired. The Commission's power to grant a § 5 approval for acquisition is not limited to the existence of a legally enforceable contract. If that were so, the Commission as a condition precedent to the exercise of its statutory responsibility would have to determine the threshold question of legal enforceability of the contract. That, of course, would put the Commission in the business which the Commission and the Courts have long recognized to be a matter for the Courts. Apart from the question of Commission approval for consummation of a contract, legal validity of such a contract presents a judicial question for judicial determination by the Courts, not the Commission. Watson Bros. Transportation Co. v. Jaffa, 8 Cir., 1944, 143 F.2d 340, 346; Texas & New Orleans R. Co. v. Brotherhood of R. Trainmen, 5 Cir., 1962, 307 F.2d 151, supra; O. C. Wiley & Sons v. United States, supra. And, as a reviewing Court, our function is no more extensive than that of the Commission in this regard. See Louisiana Development Co., Inc. v. United States, E.D.La., 1937, 18 F.Supp. 629, 632; United States v. Jones, 1949, 336 U.S. 641, 672–673, 69 S.Ct. 787, 93 L.Ed. 938; Great Northern Ry. Co. v. United States, 1928, 277 U.S. 172, 182, 48 S.Ct. 466, 72 L.Ed. 838; Pittsburg & W. Va. Ry. Co. v. United States, 1930, 281 U.S. 479, 488, 50 S.Ct. 378, 74 L.Ed. 980; New York Central Securities Corp. v. United States, 1932, 287 U.S. 12, 53 S.Ct. 45, 77 L.Ed. 138.

By recognizing, as between Central and Callan, the assignment covering the W & H stock owned by Walker, and by the imposition on Callan of all actual, immediate and ultimate liability for the obligations which Central has toward Walker for the purchase of his W & H stock, the Commission has approved consummation of the 1956 contracts. It has clothed Central with full authority and financial means (through Callan) to comply fully with Central's obligations to Walker under the 1956 contracts. So far as Commission approval is concerned, nothing further is needed. The approval given is in no sense restricted or limited merely because acquisition of Walker's W & H stock by Central is a momentary one and takes place simultaneously with the ultimate acquisition of it by Callan as the assignee of Central. The requirement of the law for a § 5 and § 214 approval and a like requirement of the contract [16] has thus been satisfied. While this holding by the Commission, approved by us, is categorical and is binding upon the parties and all courts adjudicating the controversy growing out of the contracts, neither the Commission nor this Court has, or has undertaken, to determine any other issue concerning the interpretation, application, validity, or enforceability of any one or more or all of the contracts. These matters, as we have said, are for determination by the courts in the normal way.

It follows that the complaint must be dismissed and the orders of the Commission under review are approved.

Complaint dismissed.

BEN H. RICE, Jr., District Judge (dissenting).

Since I can not agree to the rationale or to the end result of the majority opin-

16. The contract covering Express stock provided: "It is agreed that this contract shall be immediately submitted to the Interstate Commerce Commission for approval, and all parties agree to cooperate and to use due diligence to secure said approval, and that this contract is subject to such approval. * * *." The contracts concerning Cartage and W & H were contingent upon approval of Express contract.

ion referred to me by the other members of this Court, I most respectfully dissent. The contracts under consideration were integrated and were expressly made subject to the approval of the Interstate Commerce Commission. In my opinion the Interstate Commerce Commission has never approved these contracts.