**BURLINGTON NORTHERN, INC., Plaintiff,**

v.

**CHICAGO AND NORTH WESTERN TRANSPORTATION COMPANY, Defendant.**

**Civ. No. 4–79–605.**

United States District Court,
D. Minnesota,
Fourth Division.

June 26, 1980.

Charles H. White, Jr., Arnall, Golden & Gregory, Washington, D. C., James R. Walker, Leah Manning Stetzner, Burlington Northern, Inc., St. Paul, Minn., for plaintiff.

Edward M. Glennon, Kurtis A. Greenley, Lindquist & Vennum, Minneapolis, Minn., Thomas E. Acey, Jr., Verner, Liipfert, Bernhard & McPherson, Washington, D. C.,

Christopher A. Mills, Chicago, Ill., Chicago and North Western Transp. Co., for defendant.

DIANA E. MURPHY, District Judge.

In this action, plaintiff Burlington Northern, Inc. (BN), seeks a declaration by this court that the rights of defendant Chicago and North Western Transportation Co. (CNW) to participate jointly with BN in construction and operation of a railroad line, pursuant to a contract between them, were terminated by CNW's failure to make payment of its share of construction costs as required by the contract. Jurisdiction herein was found by the Honorable Edward J. Devitt in an order denying plaintiff's motion to remand to state court upon defendant's removal.[1] BN has moved for summary judgment. CNW has moved to dismiss on the following grounds: 1) lack of subject matter jurisdiction (defendant claims that the Interstate Commerce Commission (ICC) has exclusive and primary jurisdiction over this matter), 2) failure to state a claim upon which relief can be granted, 3) failure to exhaust administrative remedies, and 4) lack of ripeness. Alternatively, CNW moved to stay the summary judgment motion pending this court's determination of the jurisdictional issue raised by the motion to dismiss.

*Factual Background*

On October 10, 1972, BN filed an application with the ICC for authority to construct and operate a railroad line between Gillette and Douglas, Wyoming, to provide access to the coal deposits in the Powder River Basin from its main east-west line. On May 29, 1973, CNW filed an application with the ICC for authority to extend its line north to the Powder River Basin, parallel to the proposed BN line. The ICC took the position that BN and CNW should agree to build a joint line to avoid the adverse envi-

ronmental consequences of two separate lines. Therefore, on February 4, 1974, BN and CNW filed a joint application to build and operate a joint line. The ICC, in Finance Docket No. 27579, authorized construction and operation of the joint line on January 26, 1976, which order was to become effective May 17, 1976. Because of an appeal by the Sierra Club, which was eventually dismissed, the order did not become final until May 8, 1978.

While the application for authorization to build the line was pending, BN and CNW negotiated and executed a Joint Line Agreement (the agreement) covering terms under which the line was to be built and operated. A draft of the proposed agreement was sent to the ICC by BN with CNW's approval, stating that approval would be sought when it was finalized. The agreement was executed by the parties on May 22, 1975. By one of the provisions of the agreement, it was agreed that if CNW or any successor should ever "become part of, consolidate or merge with or come under common control" of the Union Pacific Railroad (UP), BN had a 90 day option to buy out CNW's interest in the joint line.

A Supplemental Agreement (Supp. I) was executed by the parties on June 1, 1976, because CNW could not pay the agreed upon one-half of the construction costs. A Second Supplemental Agreement (Supp. II) was executed on January 30, 1978. The supplemental agreements suspended the payment terms of the agreement, providing that CNW did not have to pay its share of the construction costs until November 30, 1977 under Supp. I, and until November 30, 1979 under Supp. II. BN commenced construction in the spring of 1978.

In an effort to obtain financing for its share of the joint line, as well as for rehabilitation of other portions of its own line,

---

1. The order relied on the standard set in *Smith v. Kansas City Title & Trust Co.*, 255 U.S. 180, 41 S.Ct. 243, 65 L.Ed. 577 (1921):

 The general rule is that, where it appears from the bill or statement of the plaintiff that the right to relief depends upon the construction or application of the Constitution or

laws of the United States . . . the District Court has jurisdiction. *Id.* at 199, 41 S.Ct. at 245.

Judge Devitt found that plaintiff's complaint disclosed a need for determining the power and responsibilities of the ICC to approve and modify the agreement.

CNW applied to the Federal Railroad Administration (FRA) for loan guarantees of $532,000,000 in August, 1978. UP objected to this application, and proposed construction of a "connector route" between its lines and CNW lines. In January, 1979, CNW adopted the UP proposal and sought loan guarantees of $232,000,000 from FRA to finance the costs of the BN–CNW joint line and rehabilitation of its own line, plus construction costs of the connector route to UP. BN entered objections to this proposal.

*Procedural Background*

On June 13, 1979, CNW applied to the ICC for approval of the BN–CNW agreement and Supp. I and II (ICC Finance Docket No. 29066) and also applied, in a related matter, for authority to construct the connector route to UP. As the time was running out under Supp. II, CNW applied to the ICC on November 15, 1979, for an interlocutory order, under Finance Docket No. 29066, extending the November 30, 1979 payment deadline. The order was denied by the ICC on November 30, 1979, but the Commission asserted that it had jurisdiction over the agreement, and over the joint construction and operation of the line, without regard to CNW's default.

On November 23, 1979, BN filed the instant complaint in state court which CNW removed to this court; BN's motion to remand was denied on December 28, 1979.

On December 5, 1979, BN petitioned the Court of Appeals for the District of Columbia to review the November 30, 1979 ICC decision, challenging the agency's jurisdiction over the agreement. The Court of Appeals denied the petition on February 25, 1980, on the basis that no final order had been made by the Commission.

BN has also sought review in the Court of Appeals of an ICC decision setting Finance Docket No. 29066 on for hearing. At a pre-hearing conference before an ICC Administrative Law Judge in January, 1980, BN moved to dismiss the proceeding. The judge ordered dismissal unless CNW paid its share of construction costs by February 25, 1980, and also disapproved certain provisions of the agreement, including the merger buy-out provisions. BN appealed the judge's order extending the time for payment, and on March 17, 1980, the ICC reversed the decision providing for dismissal unless payment was made and scheduled the application of CNW for hearing, despite the default.

CNW moved in this action on January 11, 1980, to dismiss BN's complaint, or alternatively, to stay the proceedings pending final decision on ICC Finance Docket No. 29066. On February 6, 1980, BN moved for summary judgment. After hearing on February 11, 1980, Judge Devitt ordered a stay of the proceedings

> pending a final decision of the Interstate Commerce Commission, approving, disapproving or modifying certain agreements between Plaintiff Burlington Northern, Inc. and Defendant Chicago and North Western Transportation Company relating to their joint construction and operation of a new railroad line to service the coal fields of the Powder River Basin, Wyoming, which agreements are presently the subject of Interstate Commerce Finance Docket No. 29066[,]

but agreed to hear BN's summary judgment motion at a later date.[2] CNW then renewed its motion to dismiss and moved in the alternative to stay the summary judgment motion pending this court's decision on the jurisdictional issues.

*Discussion*

An examination of defendant's challenge to this court's subject matter jurisdiction is

---

2. Judge Devitt did not rule on the motion to dismiss or address the issues raised. At the time of the hearing on CNW's motion on February 11 it appeared that the issue of ICC jurisdiction over the agreements would likely be determined by decision of the Court of Appeals for the District of Columbia on BN's petition for review of the November 30, 1979 ICC decision in Finance Docket No. 29066 and that this decision might be reached prior to the hearing on plaintiff's summary judgment motion. However, the Court of Appeals denied BN's petition for review on February 25, 1980. This court assumed responsibility for this case in March of 1980 and heard arguments on the pending motions at the end of April.

essential before consideration of plaintiff's motion for summary judgment on the merits. "Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." Fed.R.Civ.P. 12(h)(3).

CNW asserts that exclusive jurisdiction over this matter rests in the ICC by virtue of the Interstate Commerce Act, sections 11341(a),[3] 11342, and 11343(a)(6). Section 11342 requires that carrier arrangements to pool traffic and share revenues be approved by the Commission and further gives the Commission the authority to impose conditions on the parties.[4] Section 11343(a)(6) provides for Commission approval and authorization of acquisition by a carrier of joint ownership or use of a railroad line.[5]

BN argues that this court has jurisdiction over the action and is a proper forum to determine the parties' contractual rights. Traditionally, the interpretation of contracts has been a function of courts and not of regulatory agencies. The ICC has repeatedly taken the position that it will not attempt to interpret contracts between private parties subject to its regulation. *Illinois Central Gulf Railroad Co.—Acquisition —Gulf, M. & O. Railroad Co., Illinois Central Railroad Co.*, 338 I.C.C. 805 (1971); *Central Freight Lines, Inc.—Control—Alamo Express, Inc.*, 90 M.C.C. 96 (1962). This position has been supported by the courts. *Watson Brothers Transportation Co., Inc. v. Jaffa*, 143 F.2d 340 (8th Cir. 1944); *Walker v. United States*, 208 F.Supp. 388 (W.D.Tex. 1962), *aff'd*, 372 U.S. 526, 83 S.Ct. 887, 9 L.Ed.2d 965 (1963).

It appears from the statutory language and case law that the ICC has jurisdiction to review the agreements between the parties. Section III of the agreement covers operations, and paragraph B therein provides for a pooling of revenues. The agreement itself states, "[s]uch pooling shall not begin until approval therefor has been given by the Interstate Commerce Commission." Prior ICC approval is clearly necessary for pooling agreements. *Thompson v. Texas Mexican Railway Co.*, 328 U.S. 134, 66 S.Ct. 937, 90 L.Ed. 1132 (1946); *Chicago & North Western Railway Co. v. Peoria and Pekin Union Railway Co.*, 319 F.2d 117 (3d Cir. 1963); *Norfolk Southern Bus Corp. v. Virginia Dare Transportation Co., Inc.*, 159 F.2d 306 (4th Cir.), *cert. denied*, 331 U.S. 827, 67 S.Ct. 1349, 91 L.Ed. 1842 (1947). The ICC also has jurisdiction to approve operating agreements. BN argues that the ICC does not have jurisdiction over Supp. II because it does not specifically deal with operations. However, while Supp. II modified the financial arrangements between the parties and suspended the payment dates, it did not purport to cancel the rest

---

**3.** The section provides:

(a) The authority of the Interstate Commerce Commission under this subchapter is exclusive. A carrier or corporation participating in or resulting from a transaction approved by the Commission under this subchapter may carry out the transaction, own and operate property, and exercise control or franchises acquired through the transaction without the approval of a State authority. A carrier, corporation or person participating in that transaction is exempt from the antitrust laws and from all other law, including State and municipal law, as necessary to let that person carry out the transaction, hold, maintain and operate property, and exercise control or franchises acquired through the transaction. 49 U.S.C. § 11341(a) (1978).

**4.** The section provides in part:

(a) A common carrier . . . may not agree or combine with another of those carriers to pool or divide traffic or services or any

part of their earnings without the approval of the Commission . . .

(b) The Commission may impose conditions governing the pooling or division and may approve and authorize payment of a reasonable consideration between the carriers. . . .

(d) The Commission may begin a proceeding under this section on its own initiative or on application. 49 U.S.C. § 11342 (1978).

**5.** The section provides in part:

(a) The following transactions involving carriers . . . may be carried out only with the approval and authorization of the Commission:

. . . . .

(6) acquisition by a rail carrier of trackage rights over, or joint ownership in or joint use of, a railroad line . . . owned or operated by another carrier. 49 U.S.C. § 11343(a)(6) (1978).

of the agreement, including the operating provisions.[6]

Furthermore, the authority given by the ICC to construct and operate the line was subject to ·the condition that the line be jointly owned and operated,[7] and the report of the Commission accompanying its order specifically reserved jurisdiction over the financial arrangements.[8] The condition was an important factor in the ICC decisions asserting jurisdiction over the agreements.[9] The ICC has the authority to impose conditions on certificates issued under section 1(18) [10] of the Act. *Transit Commission v. United States*, 1 F.Supp. 595 (S.D.N.Y.1932), *aff'd*, 289 U.S. 121, 53 S.Ct. 536, 77 L.Ed. 1075 (1933).

Congress has given to the ICC the responsibility for encouraging "sound economic conditions in transportation, including sound economic conditions among carriers" and "the establishment and maintenance of reasonable rates for transportation." 49 U.S.C. §§ 10101(3) and (4) (1978). That mandate and the statutory sections already discussed clearly indicate that the ICC has jurisdiction to review the agreements between the parties and to approve or disapprove them.

 Although the ICC has jurisdiction over the agreements between the parties, its jurisdiction is not exclusive. The real issue for this court, whether it should exercise its jurisdiction and rule on the motion for summary judgment, requires consideration of the doctrine of primary jurisdiction. This doctrine assists a court in deciding

---

**6.** Supp. II states that it "supplements the Agreement . . . referred to as the 'Basic Agreement,' [Joint Line Agreement] covering construction and operation of . . . [the] 'Joint Line,' and cancels the . . . 'supplemental agreement.' "

**7.** The certificate and order authorizing construction of the line states:

It is ordered that the applications in Finance Docket No. 27208 [BN's single line application] and Finance Docket No. 27392 [CNW's single line application], be, and they are hereby dismissed.

. . . . . . . . . . . . .

It is hereby certified, that in Finance Docket No. 27579, the present and future public convenience and necessity requires construction and operation by Burlington Northern, Inc. and Chicago and North Western Transportation Company of a line of railroad . . . subject to the conditions for protection of the environment and employee protective conditions. . . . Certificate and Order, I.C.C. Finance Docket No. 27579, Finance Docket No. 27208, and Finance Docket No. 27392 (May 17, 1976).

**8.** The report states:

This circumstance, as well as consideration of the Nation's need for alternative sources of energy which, in part, could be met by the low-sulphur coal traffic to be transported by the line, and the fact that applicants apparently will require our prior approval under section 20a in order to effect the construction authorized herein, in our opinion, does not require a further assessment of the feasibility and fairness of the plans to finance the proposed line at this time. However, *jurisdiction is reserved for the purpose of making*

*such further conditions in this and other respects as may be required to ensure that approval will not impair applicants' present or future operations. . . . This reservation of jurisdiction coupled with our jurisdiction under section 20 of the act will permit us to continue to review applicants' financial stature, obtain necessary financial data, and if required, attach additional conditions to this authorization to ensure applicants' continued financial viability. Burlington Northern, Inc., and Chicago and North Western Transportation Co.—Construction and Operation—Between Gillette and Douglas, in Campbell and Converse Counties, Wyoming,* 348 I.C.C. 388, 402 (1976) (emphasis supplied).

**9.** In denying CNW's request for an interlocutory order extending the November 30, 1979 payment deadline, the Commission stated:

The Commission unquestionably has jurisdiction over the subject agreements under the Act. Under section 10901, Commission approval must be obtained for the construction and operation of railroad lines. Our 1976 decision in Finance Docket No. 27579 only authorized the joint construction and operation of the plan in question. Parties cannot, solely by the terms of their private agreements and without Commission approval, convert such authorized joint construction and operation into single carrier construction and operation. I.C.C. Finance Docket No. 29066 (November 30, 1979).

**10.** These applications were filed under 49 U.S.C. § 1(18) (1976), which was repealed on October 28, 1978. The new version of the section is found at 49 U.S.C. § 10901 (1978).

whether it should refrain from acting "until after an administrative agency has determined some question or some aspect of some question arising in the proceeding before the court." 1 K. Davis, Administrative Law Treatise § 19.01 (1958). An agency may be found to have primary jurisdiction where some facets of the dispute are within its statutory authority and adjudication of the dispute by the agency would be of material aid in resolving the issue before the court or clarifying what question the court should properly decide. *Ricci v. Chicago Mercantile Exchange*, 409 U.S. 289, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973); *International Travel Arrangers, Inc. v. Western Airlines, Inc.*, 623 F.2d 1255 (8th Cir. 1980).

BN cites *Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976), where it was found that the doctrine did not require that a fraudulent misrepresentation claim be deferred pending an agency determination of whether the practice complained of was a "deceptive practice" within the meaning of section 411 of the Federal Aviation Act. The factor that the Supreme Court found controlling in that case was that the common law remedy was not in irreconcilable conflict with the statutory scheme.

■ Judgment on the merits should not be rendered until the ICC has decided those aspects of a matter for which it has been given primary responsibility, especially where the matter involves the public interest, as well as the interests of the parties in an agreement. *Thompson v. Texas Mexican Railway Co.*, 328 U.S. 134, 66 S.Ct. 937, 90 L.Ed. 1132 (1946). The goal of "promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties" would be served by deferring to the ICC for its determination upon the application for approval of the agreements. *United States v. Western Pacific Railroad Co.*, 352 U.S. 59, 63, 77 S.Ct. 161, 164, 1 L.Ed.2d 126 (1956). Any finding by this court, as urged by BN, that CNW had "terminated its entitlement to participate in the ownership and operation of the joint line" would directly conflict with a possible determination by the Commission that CNW's participation is required in the public interest. For the court to rule on the summary judgment motion at this time would undercut the primary jurisdiction of the ICC.

■ When a court concludes that it should refrain from reaching the merits of an action until an administrative agency makes its determination, it has the option of retaining the case on its docket pending the administrative decision or of dismissing the action. *Far East Conference v. United States*, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576 (1952). As in *Far East*, the final administrative order in this matter will be reviewable in the Court of Appeals, no purpose would be served by holding the instant action in abeyance in the meantime, and a similar suit could be "easily initiated later, if appropriate." 342 U.S. at 577, 72 S.Ct. at 495. Although a stay might be utilized if there were an apparent statute of limitations problem, dismissal is appropriate if plaintiff's right to obtain relief is not prejudiced. *Carnation Co. v. Pacific Westbound Conference*, 383 U.S. 213, 86 S.Ct. 781, 15 L.Ed.2d 709 (1966).

Furthermore, federal jurisdiction was asserted over this action to determine the meaning of federal law and, specifically, the power and responsibility of the ICC relative to the issues raised in the complaint. Now that this court has determined that the ICC has primary jurisdiction and should be permitted to make its determination relative to the agreements in those areas in which it has statutory responsibility, prior to a court's reaching the breach of contract claim, there is a real question whether this court continues to have jurisdiction.

It is not necessary to reach the other issues raised by the parties on their motions.

## ORDER

Accordingly, upon all of the files, records and proceedings herein,

IT IS HEREBY ORDERED that defendant's motion to dismiss the complaint is granted.